Clifton REDMAN, Plaintiff–Appellant,

v.

COUNTY OF SAN DIEGO; Capt. Richard Beall; Lt. Robert Witcraft; Sgt. Dan Canfield; Deputy Gene Turner, and Does I through XX, Inclusive, Defendants–Appellees.

No. 87–6139.

United States Court of Appeals, Ninth Circuit.

Argued En Banc and Submitted Oct. 11, 1990.

Decided Aug. 26, 1991.

William D. Daley, Murphy & Daley, Chula Vista, Cal., for plaintiff-appellant.

Nathan C. Northup, Deputy County Counsel, San Diego, Cal., for defendants-appellees.

Betty Wheeler, American Civil Liberties Union, San Diego, Cal., for amicus.

Before BROWNING, GOODWIN, SCHROEDER, FLETCHER, ALARCON, REINHARDT, WIGGINS, KOZINSKI, THOMPSON, LEAVY and FERNANDEZ, Circuit Judges.

LEAVY, Circuit Judge:

Clifton Redman was raped while confined at the South Bay Detention Facility, a jail operated by the San Diego County Sheriff's Department. Redman brought an action under 42 U.S.C. § 1983 against the County and various jail officials and employees.

The district court granted a directed verdict in favor of the defendants. The court determined that Redman had failed to present evidence sufficient for a reasonable jury to conclude that Redman had been treated with "reckless indifference" or with "callous disregard" for his safety.

We consider this case en banc after a panel decision that affirmed the district court in *Redman v. County of San Diego*, 896 F.2d 362 (9th Cir.1990). We borrow extensively from that decision for our statement of facts.

We have jurisdiction under 28 U.S.C. § 1292. We affirm in part and reverse in part.

FACTS

In January 1983, Clifton Redman was booked into San Diego County's South Bay Detention Facility where he was held as a pretrial detainee. Upon arrival Redman, then eighteen years old, was placed in a receiving module designated as a "young and tender" unit.[1] Redman was 5'6" tall and weighed approximately 130 pounds. He had no prior criminal convictions.

About one week after his arrival, after a verbal exchange with another inmate, Redman was transferred from the "young and tender" module into an area housing the general population of the jail, or the "mainline" module. Redman was assigned to a two-bunk enclosed single cell with an inmate named Kevin Clark. Clark was twenty-seven years old, approximately 5'11" tall, and weighed 165 pounds. The jail officials knew that Clark was incarcerated for violating parole upon a conviction for a sex offense. According to an inmate status report on file at the facility, Clark was an aggressive homosexual. He had been

---

**1.** The dissent states that "this case is laden with terms intended to evoke an emotional response." As examples, the dissent notes "young and tender," "aggressive" homosexual, and "registrable sex offender."

We do not know who chose these terms, and for what purpose. We do know, however, that "young and tender" is a term used by jail officials at the South Bay facility. *See* Testimony of Lt. Richard Beall, Trial Transcript at 172–73, 198–99. Moreover, according to the panel opin-

ion in this case, the jail officials also classified Clark as aggressive. *Redman*, 896 F.2d at 363 ("According to an inmate status report on file at the facility, Clark was an aggressive homosexual."). The deputy county counsel, who represented the defendants, also referred to Clark as "aggressive" in his arguments in favor of the directed verdict. *See* n. 4, *infra*, at 1438. Finally, we do not use the phrase "registrable sex offender."

transferred into the mainline module from the homosexual module because of reported incidents of coercing and manipulating the homosexual inmates for sexual favors.[2]

On Redman's first night in his new cell, Clark raped Redman. Clark warned Redman not to tell anyone, or he would harm Redman's girlfriend and her family, whose address he had obtained from a letter in Redman's locker. The next day Redman telephoned his brother and his girlfriend and told them of the assault, and that he feared future attacks. The mother of Redman's girlfriend, Mrs. Pearson, called the South Bay Detention Facility and told jail personnel that Redman had been threatened with sexual assault and that her daughter had been threatened in the event Redman told anyone. She did not report a rape because she did not know that one had occurred. Trial Transcript, at 155. She did, however, report that Redman "was very afraid of being [sexually] assaulted, and ... had been threatened by people who were also in the jail, if he told anyone about any of the threats that had been made to him, that they could hurt our daughter because they knew our address from letters she had sent Clifton." *Id.*, at 151.[3] Mrs. Pearson testified that the deputy with whom she spoke responded to the effect that the South Bay Detention Facility was not operating "a baby-sitting service."

In response to this call, one of the guards on duty called Redman down to the deputy station via intercom and, within view of Clark and other inmates, asked Redman whether he was having any problems.[4] Redman replied he was not. Red-

**2.** According to a report on file at the South Bay Detention Facility dated December 28, 1982, Clark's parole officer requested that Clark be transferred to a homosexual module due to Clark's concern about being teased and sexually harassed because of his homosexuality. In response to this report, Clark had been transferred into the homosexual module. A report dated January 23, 1983, noted that a jail deputy had been "informed by an unnamed source that Clark had been coercing and manipulating other inmates in the tank for sexual favors." This report also stated: "Since Clark by jail standards isn't required to remain in [the homosexual module] he was placed in [a mainline module]."

The sexual attacks on Redman occurred in the mainline module on January 29 and January 30, 1983. For the purposes of reviewing the directed verdict, we assume that the officials responsible for Redman's transfer into the mainline unit with Clark were aware of these reports.

**3.** The following is excerpted from Mrs. Pearson's testimony:

Q. And you called then [sic] South Bay facility?
A. Yes, and I talked to two people there. The first person relayed me to the second one who was in charge of wherever Cliff was.
Q. What did you tell them, if you recall?
A. I told them that I was concerned about Cliff Redman, who was in their jail there, that he had told my daughter that he was very upset and afraid, very afraid of being assaulted, and he had been threatened by people who were also in the jail, if he told anyone about any of the threats that had been made to him, that they could also hurt our daughter because they knew our address from letters she had sent Clifton. Evidently they'd seen the address where we live.
Q. Did you convey during this conversation the fact that it was a sexual assault that was involved?
A. Yes.
Q. And what was the response or what was the gist of the person's response?
A. ... Basically that all Cliff had to do, if he had any problem at all or was afraid of anyone hurting him, is to tell them....
Q. Do you recall him saying anything further during that conversation?
A. Yes. He did say, he said, "Well, you know, we can't watch him like this is a baby-sitting service or something. You know, if he has any problems, he can call us.
Q. Did you feel as though—go ahead.
A. "We can't keep a closer eye on him."
Trial Transcript at 151–52.

**4.** The following is excerpted from the testimony of Deputy Jose Green, the guard who questioned Redman:

Q. And do you remember him coming down that day?
A. Yes, sir.
Q. What prompted you to have him come down?
A. I received a phone call from one of the control deputies that he had received a call from either his mother, I believe, that he was having some kind of problems in the mod.
Q. All right. And they didn't describe to you the kind of problem he was having?
A. No, sir.
Q. You don't recall who it was who called you?
A. No, sir.
Q. And so he came down, and how long did you talk to him?

man later testified that he lied because he was afraid of what might happen to him, his girlfriend, and her family if he told the truth. No further investigation or inquiry was made by any jail official. Redman was left in the cell with Clark.

The next day Redman was raped again, this time not only by Clark but by two other inmates. Each of the three rapists was older and larger than Redman, and each had an extensive criminal record. After the assaults, Redman again telephoned his brother, this time talking and crying for an extended period of time in an open area of the facility. The next morning Clark raped Redman again. That afternoon Redman was released from custody.

Each of the inmates who raped Redman subsequently was charged with sodomy. Each pleaded guilty.

After his release, Redman brought this action in district court under 42 U.S.C. § 1983 against the defendants County of San Diego, Sheriff John Duffy, and various individuals employed at the South Bay Detention Facility. The district court directed a verdict in favor of all defendants. Redman appeals.

## ANALYSIS

Redman contends the individually named defendants committed acts that deprived him of his constitutional right to personal security under the due process clause of the fourteenth amendment. The Supreme Court "has noted that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause. And that right is not extinguished by lawful confinement, even for penal purposes." *Youngberg v. Romeo*, 457 U.S. 307, 315, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982) (citations omitted).

Further, insufficient protection of a prisoner resulting in harm inflicted by other inmates may also violate the prisoner's due process rights. *Id.* at 315–16, 320, 102 S.Ct. at 2457–58, 2460.

We review the propriety of a directed verdict de novo. *Meehan v. County of Los Angeles*, 856 F.2d 102, 106 (9th Cir.1988). "We must view the evidence in the light most favorable to the nonmoving party and draw all inferences in favor of that party." *Id.* A directed verdict should be granted when the evidence permits only one reasonable conclusion as to the verdict. *Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 345 (9th Cir.1978). "If conflicting inferences may be drawn from the facts, the case must go to the jury." *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1448 (9th Cir.1986) (citing *Neely*, 584 F.2d at 345).

*The Level of Culpability Required to Constitute a Constitutional Deprivation*

Section 1983 [5] requires a claimant to prove (1) that a person acting under color of state law (2) committed an act that deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States. *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir. 1988). There is no dispute here that the defendants acted under color of state law. The issue is whether the defendants' conduct deprived Redman of a federally protected right.

"A person deprives another 'of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains].'"

> Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

A. Maybe a few seconds.
Q. What did you ask him?
A. "Are you having any problems in the mod?"
Q. What did he say?
A. "No."
Q. Anything else you recall being asked?
A. No, sir.
Trial Transcript at 107.

**5.** Section 1983 provides in relevant part:

*Id.* at 633 (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978)).

We must resolve the *level* of improper conduct that must be shown toward a pretrial detainee to establish insufficient protection and thus a violation of the constitutional right to personal security under the fourteenth amendment. The Supreme Court has decided that conduct that amounts to "mere negligence" by prison officials is not sufficient to trigger the substantive due process protection of the fourteenth amendment. *Daniels v. Williams*, 474 U.S. 327, 330–32, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). The threshold of conduct that will trigger that protection has been left open by the Supreme Court. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 n. 8, 109 S.Ct. 1197, 1204–05 n. 8, 103 L.Ed.2d 412 (1989); *Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986); *Daniels v. Williams*, 474 U.S. at 334 n. 3, 106 S.Ct. at 666 n. 3. Thus we must determine what conduct showing a greater level of culpability, such as "recklessness," "gross negligence," or "deliberate indifference," should apply to prison officials' treatment of a pretrial detainee. We begin with the purpose of the due process clause.

■ "The Due Process Clause of the Fourteenth Amendment provides: '[N]or shall any State deprive any person of life, liberty, or property, without due process of law.' Historically, this guarantee of due process has been applied to *deliberate* deci-

sions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. at 331, 106 S.Ct. at 665 (citations omitted). The purpose of the clause is to protect individuals from a government's arbitrary exercise of its powers. *Id.* Thus, the clause traditionally has protected against deliberately chosen, but arbitrary government actions.

We now examine how the due process clause has been applied to protect pretrial detainees in a jail or prison context.[6] We are mindful that a liberty interest protected by the due process clause involves a balancing. "In determining whether a substantive right protected by the due process clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" *Youngberg*, 457 U.S. at 320, 102 S.Ct. at 2460. Almost nowhere are the demands of an organized society greater than those placed on the management of a prison.

■ According to the Supreme Court, "the Due Process clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989) (citing *Bell v. Wolfish*, 441 U.S. 520, 535–39, 99 S.Ct. 1861, 1871–74, 60 L.Ed.2d 447 (1979)).[7] There are, however, limits on the extent to which pretrial detainees may claim they are being punished in violation of the fourteenth amendment. The government has "legitimate interests that stem from its need to manage the facility in which the individual is detained." *Bell v.*

6. This case does not present the question whether gross negligence or recklessness gives rise to a due process violation outside of the jail or prison context. Although the Supreme Court has not yet decided that question, we have. *See Fargo v. City of San Juan Bautista*, 857 F.2d 638, 639, 641 (9th Cir.1988) (holding that police officer could be held liable under section 1983 for accidently shooting handcuffed arrestee in the back if the jury found that his conduct amounted to gross negligence or recklessness).

7. The due process clause provides a different standard for pretrial detainees than does the eighth amendment's proscription against "cruel and unusual punishment" for convicted prisoners because "[a] person lawfully committed to pretrial detention has not been adjudged guilty

of any crime. He has had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'" *Bell v. Wolfish*, 441 U.S. at 536, 99 S.Ct. at 1872 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975)). Thus, while the eighth amendment proscribes cruel and unusual punishment for convicted inmates, the due process clause of the fourteenth amendment proscribes any punishment of pretrial detainees. However, convicted prisoners' liberty interests are also protected by the due process clause and the state's failure to protect such persons against assaults by other prisoners results in a constitutional violation when that failure constitutes deliberate indifference to their safety. *See infra* at 1444.

*Wolfish,* 441 U.S. at 540, 99 S.Ct. at 1874. The Supreme Court has held that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* at 546, 99 S.Ct. at 1878 (footnote omitted). Because of the importance of internal security within the corrections facility, "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Id.* at 547, 99 S.Ct. at 1878. "[Prison practices] must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* Because "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.*

Therefore, we must be cognizant of both the deference accorded to prison officials in their difficult task of managing the security needs of the prison, and the right of the pretrial detainee, once subjected to the normal limitations and conditions that attach to their confinement, to be free from punishment.

In the prison context, the government conduct that has given rise to liability under section 1983 has been "deliberate indifference." The Supreme Court has held that "deliberate indifference" to the serious medical needs of prisoners amounts to the " 'unnecessary and wanton infliction of pain' " proscribed by the eighth amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).[8] The fourteenth amendment, like the eighth amendment, "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). To this end, the *Estelle* Court relied on *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), in which the concurring opinion was based solely on the due process clause of the fourteenth amendment. *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291–92. Justice Frankfurter wrote there that the due process clause is not violated so long as the government conduct is not "repugnant to the conscience of mankind." *Resweber,* 329 U.S. at 471–72, 67 S.Ct. at 380–81 (Frankfurter, J., concurring) (citation omitted). From *Estelle,* then, conduct that is either "an unnecessary and wanton infliction of pain" or "repugnant to the conscience of mankind" is "sufficiently harmful to evidence deliberate indifference." *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 291.

Deliberate indifference is not always the ultimate level of culpability in a prison context, however. In *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), the Supreme Court was confronted with a section 1983 action brought by a convicted inmate who was seriously wounded by gunfire from prison guards during a prison riot. In this situation, the court required that the government conduct amount to more than "deliberate indifference." The Court decided that that standard "does not adequately capture the importance" of the competing obligations of avoiding the infliction of "unnecessary and wanton" pain on a convicted inmate and the institutional concerns for the safety of prison staff, other inmates, and visitors. *Whitley,* 475 U.S. at 320, 106 S.Ct. at 1084–85. The Court stated: "we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 320–21, 106 S.Ct. at 1084–85 (quotation omitted). The Court was con-

---

8. The Court made it clear that "accidents" and "inadvertent failure" do not rise to the level of deliberate indifference. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 291–92.

cerned that the force applied to quell the riot did not violate the eighth amendment by "evinc[ing] such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 321, 106 S.Ct. at 1085. We will define such indifference as "malicious" since the Court made it clear that "deliberate" indifference was inappropriate, and employed the term "malicious" to describe the level of conduct it thought necessary. The Court distinguished the "deliberate indifference" standard articulated in *Estelle,* stating that it

> was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities. Consequently, "deliberate indifference to a prisoner's serious illness or injury," *Estelle,* [429 U.S.] at 105 [97 S.Ct. at 291], can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates.

*Id.* 475 U.S. at 320, 106 S.Ct. at 1084.

This circuit, citing *Whitley,* has recognized the distinction between "deliberate" and "malicious" indifference. In *Berg v. Kincheloe,* 794 F.2d 457, 460 (9th Cir.1986), for example, a convicted inmate alleged he had been placed in protective custody to prevent an attack. Nonetheless, he was ordered to report to a job even though he had warned an officer that he would be subject to attack. Subsequently, Berg was beaten and raped at the job site. Because Berg was a convicted inmate, we analyzed his case under the eighth amendment's proscription against cruel and unusual punishment. *Id.* at 459–60. We decided that the "deliberate" rather than the "malicious" indifference standard applied because Berg's allegations were

> analogous to a case in which a prisoner-patient seeks but is denied relief from an infirmity. Here the danger comes not from the untreated disease, but the unprevented attack. The similarities between the two situations, as measured by the existence of warning and availability of redress, are obvious. As noted, in both cases, liability is measured by the "deliberate indifference" standard.

*Berg,* 794 F.2d at 461 (citations omitted).

The reasoning in *Berg* applies to the situation before us where a pretrial detainee is raped. The danger to Redman came from an unprevented attack, not from a riot situation in which the least restrictive standard of government conduct applies, out of concern for institutional safety and control.

The *Berg* court also defined what "deliberate indifference" means in this circuit:

> The "deliberate indifference" standard requires a finding of some degree of "individual culpability," but does not require an express intent to punish. The standard does not require that the guard or official believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the other hand, he must have more than a mere suspicion that an attack will occur.

*Id.* at 459 (quotations and citations omitted).

That "deliberate indifference" is the standard used to measure violations of the eighth amendment's proscription of cruel and unusual punishment does not mean it applies only to persons who may be punished. Redman's status as a pre-trial detainee who may not be punished, therefore, does not preclude application of the standard. We do not find it inappropriate that the same standard may be used under the fourteenth and eighth amendments:

> It would indeed be surprising if ... "conduct that shocks the conscience" or "afford[s] brutality the cloak of law," and so violates the Fourteenth Amendment were not also punishment "inconsistent with contemporary standards of decency" and "repugnant to the conscience of mankind" in violation of the Eighth [Amendment].

*Whitley,* 475 U.S. at 327, 106 S.Ct. at 1088

(citations omitted).[9] Moreover, we see no reason why a maturing society should employ any less a standard of tolerance toward the rape of a convicted prisoner as opposed to the rape of a pretrial detainee.

The requirement of conduct that amounts to "deliberate indifference" provides an appropriate balance of the pretrial detainees' right to not be punished with the deference given to prison officials to manage the prisons. This standard also comports with the purpose of the due process clause: to protect against the deliberate, but arbitrary, choices by government.

We therefore hold that deliberate indifference is the level of culpability that pretrial detainees must establish for a violation of their personal security interests under the fourteenth amendment. We also hold that conduct that is so wanton or reckless with respect to the "unjustified infliction of harm as is tantamount to a knowing willingness that it occur," *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085, will also suffice to establish liability because it is conduct equivalent to a deliberate choice.[10] This may be termed "reckless indifference." *Milwaukee & St. Paul R. Co. v. Arms,* 91 U.S. 489, 493, 23 L.Ed. 374 (1875) (in awarding punitive damages a jury may consider act done wilfully, or as the result of reckless indifference to the rights of others which is equivalent to an intentional violation of them), *cited in Smith v. Wade,* 461 U.S. 30, 42, 103 S.Ct. 1625, 1633, 75 L.Ed.2d 632 (1983).

Recently, the Supreme Court held that for eighth amendment claims based on official conduct, an inquiry into the state of mind of the official is necessary. *Wilson v. Seiter,* — U.S. —, —, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991). The Court decided that the official's state of mind must amount to wantonness to be a violation of the eighth amendment. Id. 111 S.Ct. at 2324. When the prisoner is challenging conditions of confinement, which includes the protection he is afforded against other inmates, id. at 2326, the Court held that "deliberate indifference" constitutes wantonness. Id. The Court further held that whether conduct "can be characterized as 'wanton' depends upon the constraints facing the official." Id. (emphasis original).

■■■■ Although we do not decide here whether the same inquiries are appropriate for claims brought by pretrial detainees under the Due Process Clause, we observe that "if . . . officials know or should know of the particular vulnerability, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability." *Colburn v. Upper Darby Township,* 838 F.2d 663, 669 (3rd Cir.1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989). Here, the officials knew of Redman's vulnerability that resulted in his initial placement in the "young and tender" unit within the South Bay Detention Facility.

### The Liability of the County of San Diego

■■■ The County may not be held liable for acts of prison officials unless "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially

---

**9.** We note that other circuits have also chosen the "deliberate indifference" standard to govern the due process rights of pretrial detainees. *See, e.g., Molton v. Cleveland,* 839 F.2d 240–243 (6th Cir.1988), *cert. denied,* 489 U.S. 1068, 109 S.Ct. 1345, 103 L.Ed.2d 814 (1989); *Colburn v. Upper Darby Township,* 838 F.2d 663, 668 (3d Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989); *Anderson v. Gutschenritter,* 836 F.2d 346, 349 (7th Cir.1988).

**10.** The Supreme Court has defined "wanton" as follows:

> "Wanton means reckless—without regard to the rights of others. . . . Wantonly means causelessly, without restraint, and in reckless disregard of the rights of others. Wantonness is defined as a licentious act of one man towards the person of another, without regard to his rights; it has also been defined as the conscious failure by one charged with a duty to exercise due care and diligence to prevent an injury after the discovery of the peril, or under circumstances where he is charged with a knowledge of such peril, and being conscious of the inevitable or probable results of such failure."

*Smith v. Wade,* 461 U.S. 30, 39–40 n. 8, 103 S.Ct. 1625, 1631–32 n. 8, 75 L.Ed.2d 632 (1983) (quoting 30 American and English Encyclopedia of Law 2–4 (2d ed. 1905) (footnotes omitted)).

adopted and promulgated by that body's officers" or if the constitutional deprivation was "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978).

█ There is evidence that the action alleged to be unconstitutional, namely, the deprivation of Redman's right to personal security by placing him in a cell with an aggressive homosexual, was the result of county policies or customs. First, the detention facility had a policy or custom of segregating homosexuals. Then, once aggressive homosexuals were discovered, the detention facility relocated them according to the policy or custom in the mainline population of the prison to protect the passive homosexuals.[11] The presumption was that "[t]he general inmate population ... is able to resist any such [homosexually aggressive] pressure." Government's Opposition to Petition for Rehearing and Rehearing En Banc, at 3. Second, the county had a policy or custom of overcrowding the prison, so that heterosexual inmates were placed in the same cell or module with aggressive homosexuals.[12] This was contrary to the desirable course of action

---

11. The following is excerpted from the testimony of Richard C. Beall, who was the captain in charge of the South Bay Detention Facility when Redman was raped:

Q. Item 4A: What is that document?

A. It is a copy of our Inmate Classification Plan, dated May 8, 1983.

Q. So this was after this incident, but it does outline the classifications within the facility?

A. Yes. It's general classification that could be used at each facility.

Q. It indicates there homosexual inmates shall be isolated from other inmates, as necessary. That's item six in Exhibit 4A.

A. That is correct.

Q. What is meant by "as necessary"?

A. Well, it would be impossible to segregate all homosexual inmates. The ones we've segregated were the ones we felt were in danger of being attacked.

Q. So it would only be those homosexuals who themselves might be physically in danger that would be separated?

A. That's what we attempted to do, yes.

Q. Was there anything for a homosexual who was aggressive as far as his being housed separately?

A. We usually didn't know about that. If we knew about it and had strong reason to believe that he would attack other persons, then we would attempt to isolate him or keep him in a small enough housing unit so he could be observed closer. We couldn't do that at South Bay Jail.

Q. You weren't able to do that at South Bay?

A. We didn't have the capability for individual housing. Trial Transcript (TT) Vol. II, at 170–71.

Q. Now, do you know or do you have any knowledge as to why a coercive manipulative homosexual would be taken out of the homosexual mod and put into a low security general dormity [sic] part of the facility?

A. He apparently was the aggressive homosexual type and not the passive, and apparently was attempting to pressure the younger ones or ones that were more passive into sexual activity. In other words, he was the aggressor, so that is why he was moved out of there. Generally, when we keep homosexuals separated, we try to keep the passive ones isolated. They are the ones who are most likely to be victims. TT Vol. II, at 191.

Q. The reason was that that wasn't something you would normally continue to house aggressive homosexuals into a homosexual tank?

A. No. That would not be a good idea. *Id.* at 192.

The deputy county counsel for the defendants made the following remarks in his argument in favor of a directed verdict:

With respect, your Honor, to the *policy* that allegedly resulted in Clark being placed into a mainline tank ... when allegedly the parole officer for Mr. Clark came in and said he's a homosexual, and he was then placed in the homosexual tank, it obviously did not work out.... He was aggressive and pressed the passive homosexual inmates in the homosexual tank for sexual favors and when they learned of that, they immediately yanked him out of there. The idea of segregating homosexuals, as Captain Beall indicated, is for the homosexual protection. Now, if you have an aggressive homosexual, he doesn't need protection. You put him in the mainline population and *presumably the other inmates in the mainline population are able to protect themselves,* and if a person does not appear to be young and tender—and that is based on appearance.... That's the standard there and *the policy itself was applied in this case.* TT Vol. II, at 266–67 (emphasis added).

12. Sergeant Canfield testified that space was not the first item of priority and admitted that at the time of this assault, the detention facility contained in excess of 300 inmates in a facility designated for 192 inmates. RT Vol. 2, 229–30.

Sergeant Canfield further testified that in his opinion, the detention facility was overcrowded

which was, as Captain Beall testified, either to isolate the aggressive homosexual or to place him in a smaller unit for observation.

The dissenting opinion authored by Judge Thompson claims that:

> the County had a policy which required the segregation of aggressive homosexuals, [but that] in practice, officials at the SBDF did not follow this policy. In contravention of the County's policy, officials put Clark in the jail's general population, and Redman was assigned to his cell. Such conduct is insufficient for the imposition of *Monell* liability.

Dissent at 11769–70. However, the record is devoid of any written County policy regarding the segregation of aggressive homosexuals.

The strongest written policy on homosexuals is in the San Diego County Sheriff's Department Manual of Policies and Procedures, which states "Homosexual inmates will be isolated from other inmates as necessary." Supplemental Excerpt of Record; *see* n. 11, *supra*, at 1444. We do not read this to require that aggressive homosexuals be segregated from the mainline population. Instead, we find that the written policy was, as explained by Lt. Beall and county counsel, intended to protect the passive homosexuals. Moreover, even if it could be said that the general policy applicable to San Diego county jail facilities was to isolate and observe sexual aggressors, the routine failure (or claimed inability) to follow the general policy at the SBDF constitutes a custom or policy which overrides, for *Monell* purposes, the general policy. The unwritten policy at the SBDF was to

put the aggressive homosexual in the mainline population, because it was assumed heterosexual inmates could protect themselves. *See* n. 11, *supra*, at 1444. Thus, we disagree with the minority's conclusion that the jailers acted in contravention of County policy.

The term "policy" "generally implies a course of action consciously chosen from among various alternatives." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). *Monell* imposes liability for injuries resulting from such a choice, because Redman's deprivation was "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–36.

We conclude that there is evidence from which a reasonable jury could find that the jail officials were acting pursuant to County policies or customs when Redman and Clark were placed in the same cell. A reasonable jury could find that these policies or customs or both exacerbated the danger posed by an aggressive homosexual to the general prison population to such an extent that they amounted to deliberate indifference to Redman's personal security, thus constituting a violation of § 1983.[13]

Because a reasonable jury could find the County liable, the directed verdict in its favor was in error. When viewed in the light most favorable to Redman, there is "substantial evidence to support a verdict" for him. *Peterson v. Kennedy*, 771 F.2d 1244, 1256 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187

---

only if there were "floor-sleepers." RT Vol. 2, 235. He did not testify the prison was considered overcrowded if potentially dangerous sex offenders could not be isolated.

**13.** We reiterate what we said in *Wood v. Ostrander*, 879 F.2d 583, 588 n. 4 (9th Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990):

"A jury presented with these facts might find Ostrander's conduct to have been "deliberately indifferent," "reckless," "grossly negligent," or merely "negligent." *See Fargo v. City of San Juan Bautista*, 857 F.2d 638, 641 (9th Cir.1988) ("When reasonable persons may dis-

agree as to whether particular conduct constitutes negligence, gross negligence or recklessness, the question is one of fact to be decided by a jury." (footnote omitted)). It is thus likely the district court will face the difficult task of defining for the jury the terms "negligence," "gross negligence," "recklessness," and "deliberate indifference." *See Daniels*, 474 U.S. at 334–35, 106 S.Ct. at 666–67; *Fargo*, 857 F.2d at 641–42."

We again point out that the two latter terms suffice to establish liability under section 1983, since "reckless" means "wanton" and is equivalent to a deliberate choice. *See* n. 11, *supra*.

(1986). We reverse the directed verdict in favor of the County.

### The Individual Defendants

The five individually named defendants in this case are Sheriff John Duffy, the Sheriff of San Diego County, who was in charge of all county detention facilities at the time Redman was incarcerated; Captain Richard Beall of the Sheriff's Department, who was the captain in charge of the South Bay Detention Facility; Lieutenant Robert Witcraft, second in command at the Facility; Sergeant Daniel Canfield, a shift supervisor and watch commander at the Facility; and Deputy Gene Turner, who worked as a station deputy.

Because we conclude the trial court erred in determining the evidence was insufficient to permit a reasonable jury to find a constitutional violation, we must now assess the individual defendants' varying roles in connection with the injury Redman sustained. At issue is whether any of the five individual defendants acted with deliberate indifference such that Redman was deprived of his constitutional right to personal security. *See Leer*, 844 F.2d at 633.

### Sheriff John Duffy

■ At the time Redman was raped, John Duffy was the sheriff of San Diego County and was in charge of all the County's detention facilities. The responsibility for operating county jails in California is placed by law upon the sheriff. See Cal.Penal Code § 4000; *Brandt v. Board of Supervisors*, 84 Cal.App.3d 598, 601, 147 Cal.Rptr. 468 (1987). The sheriff is required by statute to take charge of and keep the county jail and the prisoners in it, and is answerable for the prisoner's safekeeping. See Cal.Gov.Code § 26605, 26610, Cal.Penal Code § 4006; *Brandt*, 84 Cal. App.3d at 601, 147 Cal.Rptr. 468.

The first amended complaint alleges:

At all times herein mentioned ... Sheriff John Duffy [was] put on notice, and otherwise fully informed of the imminent peril threatening Plaintiff in that said [Sheriff Duffy] had been contacted and informed by one, RENE PEARSON, such individual having been previously informed of the situation within said detention facility by Plaintiff, of the threatened harm to Plaintiff, such person further advising that it was necessary that plaintiff be moved to a safer location within said detention facility in order to void the immediately threatened harm.

In a section 1983 action in this circuit, *respondeat superior*, or vicarious liability, may not be imposed in the absence of a state law imposing such liability.[14] *Mosher v. Saalfield*, 589 F.2d 438, 441 (9th Cir. 1978), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2883, 61 L.Ed.2d 311 (1979). Redman brought no such law to our attention. In the absence of such a law, the state official must play a personal role in the constitutional deprivation to be liable. *See id.* However, Sheriff Duffy never testified at trial. There is no evidence in the record that Sheriff Duffy was personally apprised of the telephone call from Mrs. Pearson. Thus, Sheriff Duffy was not liable for any personal involvement in the deprivation of Redman's constitutional right to personal security.

■ Nonetheless, our inquiry does not end here. "A supervisor may be liable if there exists *either* (1) his or her personal involvement in the constitutional deprivation, *or* (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989) (citing *Thompkins v. Belt*, 828 F.2d 298, 303–04 (5th Cir.1987)) (emphasis added).

Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy "itself is a repudiation of constitutional rights" and is "the moving force of the constitutional violation."

---

**14.** *Respondeat superior* is a doctrine of vicarious liability based upon the notion that the person who benefits by the acts of the servant must pay for wrongs committed by the servant; the one held liable as master need not be at fault in any way. *See* Holmes, *The History of Agency*, 4 Harv.L.Rev. 345 (1882).

*Id.* (quoting *Thompkins,* 828 F.2d at 304) (citations omitted).

This latter liability is not a form of vicarious liability. Rather, it is direct liability. Under direct liability,

plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury. The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right.

*McClelland v. Facteau,* 610 F.2d 693, 695 (10th Cir.1979). "The requisite causal connection can be established ... by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy,* 588 F.2d 740, 743–44 (9th Cir.1978).

The first amended complaint also alleges with respect to Sheriff Duffy:

Defendant[ ] ... Sheriff John Duffy [was] acting according to the custom and procedural policies of Defendant, COUNTY OF SAN DIEGO, and the San Diego County Sheriff's Department, and the laws empowering [him] as [a] ... San Diego County employee[ ], in causing the sexual assaults and batteries to Plaintiff in that the South Bay Detention Facility was filled beyond capacity, thus creating both a supervision and safety problem. By means of such overcrowding, such being known by the COUNTY OF SAN DIEGO and the San Diego County Sheriff's Department, and that it was the custom and procedural policy of the COUNTY OF SAN DIEGO and the San Diego County Sheriff's Department to continue operation of said detention facility despite such safety hazards, and for the further reason that, due to such overcrowding, Plaintiff was placed in an area of said detention facility with a high security posting, and thus a greater risk of harm to his well being, though such area was known by Defendant[ ] ... that such area was not proper for the detention of Plaintiff, and that it was the custom and procedural policy of the COUNTY OF SAN DIEGO and the San Diego County Sheriff's Department to place prisoners in improper detention areas within the facility in order to accommodate the overcrowding of said detention facility.

The record shows that at the time of Redman's assault, the South Bay Detention Facility housed over 300 detainees even though it was designed for 192, which is 56% over capacity. Officials at SBDF admitted that at any other facility, a detainee thought likely to assault others would be isolated or observed more carefully, but the overcrowding at SBDF meant that they "weren't able to do that." RT at 171; *see* RT at 209. The facility was so crowded that cells designed for one person housed multiple inmates, RT at 172, 234–35, and there was no individual housing, which made it impossible to isolate troublemakers like Clark. Thus, when Clark was found coercing sex from others in the homosexual unit, there was no way to isolate him. Instead, Clark was placed in the mainline population with the "hope that ... nothing happens." RT at 210.

Captain Beall, who was in charge of the South Bay Detention Facility, testified that he "operat[ed] under the direction of Sheriff Duffy at that time" and that "ultimately, the head of the department was ... John Duffy." Vol. II, (TT, II) at 160.

Thus there is evidence in the record of both overcrowding and Sheriff Duffy's ultimate direction of operations at the South Bay Detention Facility. If we draw all inferences in favor of Redman, *see Meehan v. County of Los Angeles,* 856 F.2d at 106, we find that a reasonable jury could find Sheriff Duffy was deliberately indifferent to Redman's personal security rights by allowing overcrowding of the South Bay Detention Facility. Moreover, a jury could find that Sheriff Duffy knew or reasonably should have known of the overcrowding at a facility under his administration and that he acquiesced in a deficient policy that was a moving force behind Redman's rape and that repudiated Redman's constitutional right to personal security. *See Hansen v. Black,* 885 F.2d at 646. A jury could likewise infer, based on Captain Beall's testi-

mony, that Sheriff Duffy approved the classification policies in effect at the facility.

### Captain Richard Beall

Captain Beall was the captain in charge of the Facility since its opening in 1982, although he operated under Sheriff Duffy's direction. According to Beall's testimony at trial, he generated all policies and had to approve all procedures that were followed at his jail. He developed an "Inmate Classification Plan" in May of 1983 that provided for the protective segregation of homosexuals. While this written plan was not officially effective until four months after Redman's rape, *see* n. 11, *supra*, the evidence at trial showed that a policy identical to it was operative at the Facility in January 1983.

Captain Beall, when asked why a "coercive manipulative homosexual would be taken out of the homosexual mod and put into a low security general dormity [sic] part of the facility," replied:

He apparently was the aggressive homosexual type and not the passive, and apparently was attempting to pressure the younger ones or ones that were more passive into sexual activity. In other words, he was the aggressor, so that is why he was moved out of there. Generally, when we keep homosexuals separated, we try to keep the passive ones isolated. They are the ones who are most likely to be victims. As it appeared here, he was more likely to be the aggressor than the victim.

TT, II at 190–91.[15] Captain Beall also testified that with someone like Kevin Clark,

We keep him away from people housed in the homosexual mod and we would house him for the most part in a general housing mod where other inmates would be of approximately the same degree of sophistication and the same security level and hope that, so to speak, that nothing happens, and that the other inmates keep in line.

*Id.* at 210. Captain Beall admitted that Clark would be put in with other inmates

"with the idea that they can protect themselves." *Id.*

Yet, Captain Beall also recognized that

[o]ur experience over the years has been the inmates most likely to be victimized in a jail are the new ones who just came in, so the reason we assign what we call young and tender and old and feeble, so to speak, inmates are these are the least likely to prey on the newer inmates, so it was a fairly good mix, we thought, and still make use of the available bed space.

*Id.* at 198–99.

Captain Beall admitted that if it was known that a homosexual was aggressive, it was best to isolate him, "[b]ut we couldn't do that at South Bay Jail." *Id.* at 171; *see* n. 11, *supra*. He also described the existence of a module in the Facility reserved for high security risk prisoners who needed "closer watching and higher level of security" including those inmates who "know[ ] how to manipulate ... inmates." *Id.* at 179.

Based on this testimony, a reasonable jury could conclude that Captain Beall developed and implemented policies that were deliberately indifferent to Redman's personal security and were a moving force in the violation of his constitutional rights. Beall assumed that heterosexual inmates are more able to protect themselves from an aggressive homosexual than could passive homosexuals. A reasonable jury could find that such an assumption exhibited deliberate indifference to the potential security risks posed by an aggressive homosexual to heterosexual inmates. The jury could conclude it was deliberately indifferent of Captain Beall to recognize a particular risk to young inmates, yet allow them to be placed in the mainline population. The jury could further conclude that Captain Beall was deliberately indifferent in that he was cognizant of a need to isolate an individual like Clark, yet did not place him in an existing high security module where he would be with inmates of comparable sophistication.

---

**15.** *See supra* note 11.

Given the substantial evidence from which a reasonable jury might conclude that Captain Beall was deliberately indifferent to the personal security needs of heterosexual inmates, it was error to dismiss the case against him.

### Lieutenant Witcraft

■ Among other supervisory and administrative duties that included relieving Captain Beall when he was absent, Lieutenant Robert Witcraft executed Captain Beall's policies, procedures, and orders. Trial Transcript, Vol. II, at 214. As such, he was familiar with those policies and procedures. There was no evidence in the record, however, indicating that Lieutenant Witcraft was responsible for developing and promulgating the policies in question. That he was familiar with the policies and procedures, and implemented them as required by his supervisor, does not afford a basis for holding him liable as a policymaker under § 1983. There was likewise no evidence presented that Lieutenant Witcraft participated directly in the violation of Redman's constitutional rights.

### Sergeant Daniel Canfield

■ There is no evidence in the record that Sergeant Canfield, who acted as shift supervisor and watch commander at South Bay Detention Facility, had any hand in devising the policies that caused the alleged violation of Redman's personal security rights. There is also no evidence that he acted personally in any way, or directed others to act, to cause Redman's injuries. His testimony at trial served only to illustrate how the facility operated in certain areas. Consequently, there is no evidence upon which a reasonable jury could conclude that Sergeant Canfield was deliberately indifferent to Redman's right to be personally secure.

### Deputy Carl Turner

■ Deputy Carl Turner was the deputy sheriff who handled the day-to-day functioning of the South Bay Detention Facility. There was no evidence that he either made policy or performed an act or neglect-ed to perform an act that resulted in Redman's injuries. His testimony, like Sergeant Canfield's, was merely illustrative of how the jail operated. From it, no reasonable jury could conclude that Deputy Turner was deliberately indifferent to Redman's situation.

### CONCLUSION

We hold that a pretrial detainee establishes a violation of the right to personal security under the due process clause of the fourteenth amendment by demonstrating either that prison officials acted with "deliberate indifference" or that their conduct was so reckless as to be tantamount to a desire to inflict harm. Because the evidence in this case would permit a reasonable jury to conclude that the county and two of the individually named defendants were deliberately indifferent to Redman's constitutional right to personal security, we reverse the district court's order that granted a directed verdict in favor of all of the defendants.

AFFIRMED IN PART; REVERSED IN PART; and REMANDED for trial.

All parties are to bear their own costs on appeal.

DAVID R. THOMPSON, Circuit Judge, with whom Circuit Judge ALARCON, joins, Dissenting:

This case is laden with terms intended to evoke an emotional response. Jail officials placed an "aggressive" homosexual, who is a "registrable sex offender," in the same cell with a "young and tender" plaintiff. I agree with the majority that a pretrial detainee must show conduct amounting to deliberate indifference to pursue a section 1983 action. To apply this standard, however, we need to look beyond the labels and examine the evidence.

The evidence presented by Redman does not approach the requisite level of culpability adopted by this court today. There has been no showing that the County or the individual defendants acted with deliberate indifference to Redman's right to personal security. Further, Redman failed to present evidence that his injuries were

caused by action taken pursuant to a "policy" or "custom" promulgated by the County of San Diego ("County") or any particular policymaker. In fact, the evidence shows that jail officials acted in contravention of the County's policy regarding inmate segregation and placements. Although jail officials may have erred by assigning Redman to Clark's cell, they were not acting pursuant to an official policy or custom or with deliberate indifference to Redman's right to personal security. Accordingly, I respectfully dissent from the majority's reversal of the directed verdict.

## A. Requisite Level of Culpability

I agree with the majority that deliberate indifference is the level of culpability required to show that a pretrial detainee has been deprived of his or her right to personal security under the fourteenth amendment. The contours of this level of culpability, however, need clarification.

In adopting the standard of deliberate indifference, this court does not engage in a matter of mere semantics. Requiring deliberate indifference recognizes the high degree of deference owed by the courts to the informed decisions of prison officials. This standard acknowledges that prison officials, rather than the courts, are the individuals charged with making complex decisions involving a host of competing considerations, and are better capable of making these decisions. In examining the evidence, we must keep in mind:

> [C]ourts should defer to the informed discretion of prison administrators because the realities of running a corrections institution are complex and difficult, courts are ill equipped to deal with these problems, and the management of these facilities is confided to the Executive and Legislative Branches, not the Judicial Branch.

*Bell v. Wolfish*, 441 U.S. 520, 547 n. 29, 99 S.Ct. 1861, 1878 n. 29, 60 L.Ed.2d 447 (1979).

Although deliberate indifference does not require an intent to deprive an individual of his or her rights, or a "knowing willing-ness" that such consequences will occur, *Whitley v. Albers*, 475 U.S. 312, 321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986), the standard does require a greater degree of culpability than negligence or gross negligence. To act in deliberate indifference to another's rights, a defendant must have an awareness of a high probability of harm, and yet, consciously choose to disregard the risk. *See Walker v. Norris*, 917 F.2d 1449, 1454 (6th Cir.1990) (actor exhibits deliberate indifference by deliberately disregarding risk after becoming aware of risk). Because a defendant will rarely admit an awareness and conscious disregard of a risk, the trier of fact must examine objective criteria. W. Keeton, Prosser and Keeton on Torts 213 (5th ed.1984); *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 558 (1st Cir.) (infer actor's knowledge of risk based on magnitude of risk), *cert. denied*, 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988). This requires an analysis of the surrounding circumstances, which include the context in which the defendant chooses a course of action and the obviousness of the risk resulting from the defendant's conduct. I assume this method of proving deliberate indifference is what the majority refers to when stating reckless conduct is "equivalent to a deliberate choice." *See also Fargo v. City of San Juan Bautista*, 857 F.2d 638, 642 n. 7 (9th Cir.1988) (trier of fact may infer conscious disregard from conduct).

Thus, to prove deliberate indifference, or a conscious decision to disregard another's rights, the context must be examined. As we stated in *Berg v. Kincheloe*, 794 F.2d 457 (9th Cir.1986), in applying the standard of deliberate indifference, the trier of fact must

> consider whether, in allegedly exposing the prisoner to danger, the defendant prison official(s) were guided by considerations of safety to other inmates.... More generally, the legal standard must not be applied to an idealized vision of prison life, but to the prison as it exists, and as prison official(s) are realistically capable of influencing.

*Id.* at 462.

An analysis of the context in which prison officials act requires the trier of fact to

recognize the turbulent environment of a prison. " 'Prisons by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial, criminal, and often violent conduct.' " *Id.* at 461 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)). Further, the " '[p]rison setting is, at best, tense. It is sometimes explosive, and always potentially dangerous.' " *Id.* (quoting *Marchesani v. McCune*, 531 F.2d 459, 462 (10th Cir.), *cert. denied*, 429 U.S. 846, 97 S.Ct. 127, 50 L.Ed.2d 117 (1976)); *see also Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir. 1986) (in assigning inmates, officials must not only predict behavior of single inmate, but must predict behavior of entire prison population), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).

Further, by adopting the standard of deliberate indifference, rather than a lesser standard of culpability, we acknowledge the broad discretion afforded prison administrators. The trier of fact, therefore, is not to reweigh the considerations affecting a choice of conduct and substitute its judgment as to the appropriate balance. If the course of conduct is affected by valid justifications in light of a risk which is not so great that a different course of conduct is mandated, the trier of fact must defer to the actor's choice of conduct. It is in this context that the evidence of the defendants' culpability must be considered.

B.  County Policy

As the Supreme Court has stated repeatedly, to impose liability on a local government, the act or omission causing the deprivation of a constitutional right must be pursuant to an official policy or custom. *See, e.g., Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). A County may be held liable under section 1983 "only where its policies are the 'moving force [behind] the constitutional violation.' " *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (quoting *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981)). The Supreme Court has emphasized a County may not be held vicariously liable for the acts of its employees. *See, e.g., Monell*, 436 U.S. at 691, 98 S.Ct. at 2036.

> The "official policy" requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.

*Pembaur v. Cincinnati*, 475 U.S. 469, 479–80, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986) (footnote omitted).

In reviewing allegations that a governmental policy or custom caused the violation of a plaintiff's constitutional rights, we must carefully examine the evidence to ensure vicarious liability is not imposed. *See City of Oklahoma v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791 (1985). A policy may be shown "where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by policymakers. *Meehan v. County of Los Angeles*, 856 F.2d 102, 107 (9th Cir.1988) (quoting *Pembaur*, 475 U.S. at 483–84, 106 S.Ct. at 1300). Of course, "bald allegations" of a policy or custom are not sufficient, *Polk*, 454 U.S. at 326, 102 S.Ct. at 454, and evidence of more than a "nebulous" policy or custom is required. *Tuttle*, 471 U.S. at 823, 105 S.Ct. at 2436. Without such evidence, the plaintiff has failed to present a case for the jury. *See id.* at 823–24, 105 S.Ct. at 2436–37.

The majority holds either of two County policies or customs was the "moving force" behind the deprivation of Redman's right to personal security. Neither of these purported "policies" was established by the evidence.

First, according to the majority, the County adopted a policy or custom of placing aggressive homosexuals in the mainline or general jail population, on the assumption that heterosexual inmates could protect themselves from homosexual assaults. The evidence showed, however, that the County had a written policy of *segregating*

aggressive homosexuals into isolation or special housing, and jail officials were aware of this requirement. Reporter's Transcript, Vol. II, at 171, 235–36.[1] Due to a lack of special housing, officials at the South Bay Detention Facility ("SBDF") could not segregate the homosexuals. *Id.* at 171–72. Special rooms designed to house a single, troublesome prisoner were being used to house two prisoners. *Id.* Thus, although the County had a policy which required the segregation of aggressive homosexuals, in practice, officials at the SBDF did not follow this policy. In contravention of the County's policy, officials put Clark in the jail's general population, and Redman was assigned to his cell. Such conduct is insufficient for the imposition of *Monell* liability.

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.

*City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988).

Thus, contrary to the majority's assertions, the County did not adopt a policy or custom of placing aggressive homosexuals into the general population of the jail. Nevertheless, the majority imposes liability upon the County based on Captain Beall's assumption that heterosexuals in the general population can protect themselves from homosexuals who have been aggressive toward passive homosexuals in the homosexual module. Redman, however, failed to present evidence that Captain Beall possessed policymaking authority. An official's acts may not be considered governmental policy unless "the official has been given '*final authority* to establish municipal policy with respect to the

[challenged] action.'" *Hammond v. County of Madera,* 859 F.2d 797, 802 (9th Cir.1988) (quoting *Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299). Captain Beall testified he operated under the direction of Sheriff Duffy and reported to an immediate superior, Inspector Powell. *Id.* The mere fact that Captain Beall could exercise discretion in executing the County's policies and supervised the actions of deputies does not indicate he was a policymaker.

> The fact that a particular official ... has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.

*Collins v. City of San Diego,* 841 F.2d 337, 341–42 (9th Cir.1988) (quoting *Pembaur,* 475 U.S. at 481–82, 106 S.Ct. at 1299). In sum, the evidence does not support the majority's conclusion that the County adopted a policy or custom of placing aggressive homosexuals into the general population.

The majority then turns to overcrowding as a possible policy or custom. There was no evidence of the existence of such a County policy.

As discussed above, a "policy" is defined as a *deliberate* choice made by officials with final authority over the subject matter at issue. *See also Pembaur,* 475 U.S. at 481 n. 9, 106 S.Ct. at 1299 n. 9 (a "policy" is a "'specific decision ... designed to carry out such a chosen course of action.'") (quoting Webster's Third New International Dictionary 1754 (1981)); *Tuttle,* 471 U.S. at 823, 105 S.Ct. at 2436 (the term "policy" "generally implies a course of action consciously chosen from among various alternatives").

In *City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 1205–06, 103

---

1. The evidence indicating the County had a policy of segregating aggressive homosexuals includes testimony by Captain Richard Beall:

   Q: Was there anything for a homosexual who was aggressive as far as his being housed separately?

   A: We usually didn't know about that. If we knew about it and had strong reason to believe that he would attack other persons, *then we would attempt to isolate him or keep in a small enough housing unit so he could be observed closer....*

   Reporter's Transcript, Vol. II, at 171. In addition, Deputy Gene Turner testified:

   Q: You're aware of the requirement that those who are individuals who are *prone to assault staff or other inmates would be segregated; is that correct?*

   A: Yes, sir.

   *Id.* at 235–36.

L.Ed.2d 412 (1989), the Supreme Court held inadequate training could represent a "policy" for which liability could be imposed upon a local government. To establish the existence of such a policy, the Court required proof of facts evidencing the local government's awareness of a high probability of harm if the government failed to act.

> [T]he need for more or different training [may be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible....

*Id.* (footnote omitted). Justice O'Connor clarified this requirement in her concurrence:

> Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied. *Only then can it be said that the municipality has made "'a deliberate choice to follow a course of action ... from among various alternatives.'"*

*Id.* at 396, 109 S.Ct. at 1208 (quoting *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300) (emphasis added).

In the present case, Redman did not present any evidence that the County had actual or constructive notice that overcrowding presented a high probability of assault. To the contrary, as the majority acknowledges, Deputy Canfield testified he did not believe the SBDF was overcrowded. Reporter's Transcript, Vol. II, at 235. More important, both Captain Beall and Deputy Green testified they were not aware of any sexual assaults at the SBDF prior to the assault at issue in this case. Reporter's Transcript, Vols. I & II, at 113, 117, 211. From the record before us, it cannot be said the County was aware of a problem at the SBDF due to overcrowding and made a deliberate choice to ignore the

problem or to refuse to take corrective action. *Monell* liability may not be imposed on the basis of this nonexistent policy.

Redman also failed to present evidence that the practice of placing aggressive homosexuals into the jail's general population, or the practice of housing two persons in a cell designed to hold one person, was attributable to a decision made by any "policymaker." As discussed above, there is no evidence that Captain Beall was a policymaker. There also is no evidence linking Sheriff Duffy to either of the purported County policies. The record is silent as to any role played by Sheriff Duffy other than the fact that he was the "head of the department." Reporter's Transcript, Vol. II, at 160.

In sum, there is no evidence of the existence of either County policy relied upon by the majority, nor is there any evidence that local practices at the SBDF were implemented by any policymaker. Thus, there is no basis for the imposition of liability against the County, or against any of the defendants, on the ground that a governmental policy caused the deprivation of Redman's constitutional right to personal security.

## C. County's Culpability

Even assuming Redman introduced sufficient evidence that jail officials acted pursuant to relevant County policies, the evidence falls far short of establishing that these policies were applied with deliberate indifference to Redman's right to personal security.

The policies identified by the majority focus on the placement of Clark in the general population and the assignment of Redman to Clark's cell. The subsequent call from Mrs. Pearson, the mother of Redman's girlfriend, and the nature of the investigation by Deputy Green in response to the call are not relevant to these asserted policies. Deputy Green's investigation may have been negligent, or perhaps more than negligent, but the majority makes no attempt to label Deputy Green a "policy-

maker" or to attribute his investigation to a County policy.

The only evidence relied on by the majority to reach its conclusion that the County acted with deliberate indifference by placing Clark in the general population and by assigning Redman to Clark's cell is Clark's coercion of passive homosexuals while he was in the homosexual module. The evidence shows, however, that Clark did not misbehave while he was in the jail's general population before he was transferred to the homosexual module or while he was in a low-security housing dorm after his transfer from the homosexual module. *See* Reporter's Transcript, Vol. II, at 189–90. Contrary to the majority's assumption, it was Clark who was at risk of being victimized in the general population by heterosexual inmates. While in the general population, the heterosexual inmates teased and sexually harassed Clark. *Id.* at 189. Clark's parole officer requested Clark's transfer to the homosexual unit because Clark had been the victim of harassment in the general population. *Id.* The evidence also shows that no sexual assaults had occurred at SBDF prior to the assault in this case. Reporter's Transcript, Vols. I & II, at 113, 117, 211. Further, there is no evidence that a homosexual who coerces "passive" homosexuals presents a threat to heterosexuals. This is simply an assumption inherent in the majority opinion without any support whatsoever in the evidence.

The majority also fails to consider the countervailing interests involved in placing an inmate such as Clark. Had officials not moved Clark out of the homosexual module, we would likely be addressing a section 1983 claim by an inmate victim assigned to the "passive" homosexual module. But the jail officials did move Clark. They moved him back into the general population where he had been the victim of harassment, but had never threatened a heterosexual. This involved a risk to Clark. It is not beyond peradventure that if Clark had been attacked, we would now be addressing a section 1983 claim by him. The point is that the placement of inmates within a jail is not an easy task and in-

volves a number of competing concerns. Prison officials at the SBDF made a reasoned judgment where and with whom to house Clark based on information available to them. There is no evidence that the officials' choice was unreasonable, much less deliberately indifferent. Given these circumstances, this court should not substitute its asserted omniscience for the reasoned choices made by the jail officials.

D. Individual Defendants' Culpability

To impose liability under section 1983 on an individual defendant, the defendant's act or omission must *cause* the deprivation of the plaintiff's constitutional rights. The element of causation is "individualized and focus[es] on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir.1988). Further, the plaintiff "must establish *individual fault* ... as to each individual defendant's deliberate indifference." *Id.* at 634 (emphasis added).

When examining the liability of supervisors, "It is clear that the supervisors are not subject to vicarious liability, but are liable only for their own conduct." *Bergquist v. County of Cochise*, 806 F.2d 1364, 1369 (9th Cir.1986); *see also Hansen v. Black*, 885 F.2d 642, 645 (9th Cir.1989) ("supervisory officials are not liable for actions of subordinates on any theory of vicarious liability"); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir.1989) (supervisor is not "vicariously liable for the fault of personnel" at the prison).

We have clarified the need for proof of a supervisor's individual fault:

> A supervisor may be liable if there exists either (1) his or her *personal* involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.

*Hansen*, 885 F.2d at 646 (emphasis added). The "sufficient causal connection" may be shown by evidence that the supervisor "implement[ed] a policy so deficient that the

policy 'itself is a repudiation of constitutional rights....'" *Id.* (quoting *Thompkins v. Belt,* 828 F.2d 298, 304 (5th Cir. 1987)). However, an individual's "general responsibility for supervising the operations of a prison is insufficient to establish personal involvement." *Ouzts v. Cummins,* 825 F.2d 1276, 1277 (8th Cir.1987). The evidence of the individual defendants' conduct must be examined in light of these principles.[2]

Redman failed to present any evidence of wrongful conduct by Sheriff Duffy. There is no evidence Sheriff Duffy was personally involved in the transfer of Clark to the jail's general population or the assignment of Redman to a cell with Clark. There also is no evidence Sheriff Duffy implemented the policies identified by the majority. The *only* evidence concerning Sheriff Duffy's responsibility for Redman's injuries is testimony by Captain Beall that Sheriff Duffy was "the head of the department." Reporter's Transcript, Vol. II, at 160.

The majority bases Sheriff Duffy's liability on his general supervisory responsibility over all county detention facilities. The majority concludes the jury could find Sheriff Duffy liable because there was evidence of "Sheriff Duffy's ultimate direction of operations at the South Bay Detention Facility." This evidence is not sufficient to show that Sheriff Duffy was personally involved in wrongful conduct, that he participated in implementing a deficient policy, or that his actions caused Redman's injury.

In its attempt to avoid imputing the acts of subordinates to Sheriff Duffy to hold him vicariously liable, the majority relies on *unsupported* allegations in the complaint linking Sheriff Duffy to overcrowding of the jail. Contrary to these allegations, no evidence was produced at trial that Sheriff Duffy was responsible for, or even aware of, the alleged overcrowding at SBDF. The majority also cites with approval the portion of the complaint alleging Sheriff Duffy acted with deliberate indifference by "continu[ing] operations at [SBDF] despite

such [overcrowding]...." If this is true, to avoid liability, presumably sheriffs should "cease operations" at all jails which have an inmate population that exceeds design capacity; or perhaps they should arbitrarily release prisoners until the design capacity is not exceeded. Another option might be to transfer inmates to some undercrowded facility, but this presumes a fact not in evidence: that such a facility exists. These options, of course, are not viable. Yet by relying on "overcrowding," the majority subjects Sheriff Duffy to liability without any showing that he knew about the alleged overcrowding or could have done anything about it if he did.

The majority apparently concludes Captain Beall is responsible for Redman's injuries because he approved policies generated by the staff at the SBDF. *See* Reporter's Transcript, Vol. II, at 175. The majority identifies the relevant policy as that of placing aggressive homosexuals into the general population. The majority first attributes this "policy" to the County even though the County had no such policy and despite the absence of any evidence that Captain Beall was a policy-maker. The majority then equates this "policy" with a practice at the SBDF for which it holds Captain Beall responsible.

Even assuming Captain Beall was responsible for this practice because he directed the placement of inmates at the SBDF, neither placing Clark into the jail's general population nor placing Redman in Clark's cell was deliberately indifferent to Redman's interest in personal security. As discussed in preceding Section B, the jail officials did not act with deliberate indifference by placing Clark into the jail's general population. The majority ignores the fact that there is no evidence Clark posed a threat to any heterosexual inmate while Clark was in the jail's general population prior to his transfer to the homosexual module or while in a low-security housing dorm after his transfer from the homosexual module. Moreover, as previously stated, Captain Beall was not aware of any

---

**2.** Deputy Green's conduct is not examined because he was never a defendant in the case; and, in any event, his conduct may not be imputed to any other defendant to establish liability under 42 U.S.C. § 1983. *Bergquist,* 806 F.2d at 1369.

sexual assaults at the SBDF prior to the assault in this case.

The majority also concludes a reasonable jury could find Captain Beall was deliberately indifferent because he was responsible for Redman's placement into the general population. The majority opinion states Captain Beall "recogniz[ed] a particular risk to young inmates," and ignored this risk by placing "young inmates" into the general population. The majority apparently believes Clark was a threat to Redman because Redman was classified as a "young and tender" inmate requiring special housing. There is no evidence, however, that Redman was ever classified as a "young and tender" inmate or any other type of inmate requiring special housing. Deputy Green and Captain Beall testified they did not believe Redman fit the classification of a "young and tender" inmate or any other type of inmate requiring special housing. Reporter's Transcript, Vols. I & II, at 126, 208. Inmates not requiring special housing were placed into the general population. *Id.* at 176. Although Redman was initially housed in the young and tender module, pretrial detainees often were placed in that module so that jail officials could easily locate the detainees for transportation to court. *Id.* at 199, 202, 248.

## CONCLUSION

There is no evidence in this case of the existence of any County policy which caused Redman's injury. Nor is there any evidence that any defendant was a policymaker or was deliberately indifferent to Redman's interest in personal security. Accordingly, the district court properly granted the defense motion for a directed verdict. I respectfully dissent from the majority opinion which holds to the contrary.

FERNANDEZ, Circuit Judge, Dissenting:

I agree with the general approach of the majority to the legal standards, but, as Judge Thompson so eloquently points out, its application of the standards seems to suggest that a policy of placing all inmates in the general population unless there is some clear indication that the person is a danger or in danger amounts to deliberate indifference. In other words, it seems to suggest that those who run jail facilities must either segregate everyone from everyone else, or prove that there is no danger from mixing them. If that is what is meant, I cannot agree, for it smacks of the kind of judicial intrusion into the management of the jail system that we should eschew.

Moreover, I do agree that if a policy or custom called for the placement of known physically violent inmates with others who are known to be vulnerable to violence, there would, at the very least, be a jury question on the issue of deliberate indifference. Furthermore, if that policy or custom were caused by the dangerous overcrowding of the facility, I should think that, absent evidence to the contrary, a jury could infer knowledge and acquiescence by the policymakers in the decision to allow the facility to be overcrowded. Nor would the fact that overcrowding throughout our jail and prison system is largely driven by economics make a difference. That kind of economics does not define our constitutional rights. In any event, economists have expatiated on the value to be found in enforcement of individual rights when we wish to encourage people to rethink their attitudes toward imposing risks on others in order to save initial outlays of money by themselves. I need not rehearse the well known economic arguments here.[1]

However, as Judge Thompson again demonstrates, the majority does not point to evidence that would justify a determination that deliberate indifference was involved in the placement of these particular

---

**1.** But *cf. Wilson v. Seiter,* —— U.S. ——, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (The concurring opinion expressed particular concerns about economics, *id.* —— U.S. at ——, 111 S.Ct. at 2329– 31 (White, J.), which were not directly reached by the majority, *id.* —— U.S. at ——, 111 S.Ct. at 2326–27).

actors in the general prison population or together. True it is that the terrible events which ensued showed that Clark and Redman should not have been housed together. That, however, is a far cry from showing that the decision to house them was deliberately indifferent or resulted from a deliberately indifferent policy. In fact, it appears that the evidence of acts of deliberate indifference is to be found in the attitudes taken by individual jailers after the danger to Redman became more readily apparent. Strangely enough, the person most directly connected with that wrongdoing was not even joined as a defendant.

In short, the evidence here may support a common law tort remedy; it will not support a constitutional tort remedy.[2]

Thus, I join in Judge Thompson's dissent.

---

**2.** *Wilson v. Seiter, id.,* underscores this.