29 F.3d 637
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
VICRON II, INC., et al., Plaintiffs-Appellants,
v.
WELLCORP INTERNATIONAL, et al., Defendants-Appellees.
 No. 92-17034.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 15, 1994.
Decided July 15, 1994.
 
 1
 Before: D.W. NELSON and BEEZER, Circuit Judges, and LETTS,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 This is an appeal from a judgment of the United States District Court for the District of Nevada wherein Judge Howard D. McKibben granted the motion of Appellee Primark Corporation ("Primark") for a directed verdict pursuant to Federal Rule of Civil Procedure 50(a). This court has jurisdiction over Vicron's appeal pursuant to 28 U.S.C. Sec. 1291. We affirm.
 
 I.
 
 4
 In 1986, Laurel Bigelow and John Beresford formed Vicron, Incorporated ("Vicron"). Laurel Bigelow became the president of Vicron, Jewell Roberts the vice-president, and John Beresford the secretary. Vicron developed and marketed computer software which performed all of the accounting functions for various types of health care organizations.
 
 
 5
 In early 1987, Vicron became interested either in conducting business with a company that had a larger marketing force or in selling its assets to a company that had better marketing capabilities. In February or March of 1987, Bigelow contacted Wellcorp, which at that time was developing and selling a central processing system for chiropractors. Bigelow met with Charles Broes from Wellcorp to see about consolidating market forces.
 
 
 6
 Beresford met with Broes at Wellcorp headquarters in Nevada to examine the company. Beresford testified that he was enthusiastic about pursuing a relationship between Vicron and Wellcorp but that he noticed that Wellcorp was short on cash. He loaned Wellcorp one hundred forty thousand dollars ($140,000) and received a promissory note in return.
 
 
 7
 Soon thereafter, Wellcorp began marketing Vicron's products, but the two companies continued to operate separately. At the same time, Broes was looking for additional funding for Wellcorp, which continued to be short on cash. A possible merger between Vicron, Wellcorp, and a company called Pink Panda was discussed, but never consummated.
 
 
 8
 In August of 1988, Bigelow heard that Wellcorp was in the process of acquiring solid financing. He called Broes in Reno and asked him if Broes wanted to acquire the Vicron software. Bigelow and Broes met at the end of August, 1988 to discuss ways in which Wellcorp could acquire the assets of Vicron. Broes told Bigelow that the Agreement would have to be finalized quickly since Wellcorp was in the process of securing an investment of approximately 2.1 million dollars from an Illinois company and at least a 2.5 million dollar investment from Primark, a company in Virginia.
 
 
 9
 At the end of August, 1988, Roberts and Bigelow of Vicron met with Broes in Mill Valley, California. They discussed Wellcorp's acquisition of Vicron's assets. Broes asked Bigelow whether he would like to verify the Primark investment. Bigelow responded affirmatively. Broes dialed the phone and handed the receiver to Bigelow. Bigelow asked the person on the line whether they were from Primark and the person responded that they were. The person said that Primark was going to make an investment in Wellcorp in two or three phases and that the first phase would follow shortly thereafter. The person said that Broes was Primark's agent and that Broes would make the decisions.
 
 
 10
 Bigelow testified that he did not know who the other person was on the telephone, and that he never asked the person's identity. There is no testimony that Bigelow asked what the terms of the investment were or inquired about the agency relationship between Broes and Primark. No other evidence, such as phone records or testimony by Primark employees were admitted to evidence the phone call.
 
 
 11
 Broes and Bigelow then agreed that they would obtain board approval and sign a letter of intent whereby an exchange of stock between Vicron and Wellcorp would occur.
 
 
 12
 On August 30, 1988, Beresford and Broes met in Los Angeles. Broes told Beresford that Primark was going to make a major investment in Wellcorp. Broes stated "unequivocally" that the investment was definite.
 
 
 13
 Beresford returned to Phoenix. He went to the library to research Primark in Standard and Poors and concluded that Primark was a "rather substantial company."
 
 
 14
 Broes sent Bigelow a Letter of Intent dated September 9, 1988, which set forth the intentions of Wellcorp to acquire all outstanding Vicron stock and all of Vicron's assets, including "the source codes and all right, title and interest in the Vicron I and II software, free and clear of any rights or claims of any other person or entity (including the principals of Vicron), except for licenses as may have been granted to end users not for resale." Broes signed the letter as chief executive officer of Wellcorp.
 
 
 15
 The letter further stated that "Wellcorp shall verify to Vicron that Wellcorp has obtained funding in excess of the sum of $2.0 million within the preceding 90 days prior to the effective date of the Agreement." Plaintiff's Exhibit 10 at p. 2. There is no mention of Primark anywhere in the letter.
 
 
 16
 On September 16, 1988, Broes travelled to the Vicron offices in Phoenix and met with Bigelow and Beresford. Broes said that the first $500,000 investment by Primark was imminent and that the balance would follow later in the month.
 
 
 17
 After receiving these assurances, the parties executed the Agreement on September 17, 1988. The next day, Vicron delivered its assets to Wellcorp, but retained the security key to the software.
 
 
 18
 In December of 1988, Wellcorp filed an involuntary petition for bankruptcy. During the bankruptcy proceedings, Primark purchased the assets of Wellcorp.
 
 
 19
 In February of 1989, after Bigelow was notified of Wellcorp's bankruptcy, Bigelow and Beresford phoned Kargula, who confirmed the bankruptcy and stated that Primark's $500,000 investment in Wellcorp was made in the form of a loan.
 
 
 20
 Vicron never received the two hundred twenty-five thousand (225,000) shares of Wellcorp stock as promised in the Agreement.
 
 
 21
 On April 11, 1989, Vicron filed a complaint in the United States Bankruptcy Court for the District of Nevada against Wellcorp and certain other non-debtor corporations and individuals. The complaint alleged several causes of action, including fraud, breach of contract, RICO and violation of the securities laws. On January 26, 1990, Vicron filed a first amended complaint and demand for a jury trial in the United States District Court for the District of Nevada. Vicron filed a second amended complaint on April 1, 1991, adding Primark as an additional defendant.
 
 
 22
 On February 24, 1992, a jury trial began before Judge McKibben. On February 26, 1992, at the conclusion of Vicron's case, Judge McKibben granted Wellcorp's motion for judgment as a matter of law, made pursuant to Federal Rule of Civil Procedure 50(a), and entered judgment in favor of Wellcorp and against Vicron. Vicron challenges Judge McKibben's decision only as far as it relates to the common law fraud claim.
 
 II.
 
 23
 We review the granting of summary judgment de novo. See, e.g., Redman v. County of San Diego, 942 F.2d 1435, 1439 (9th Cir.1991) (en banc ), cert. denied, 112 S.Ct. 972 (1992). "We affirm if the record, read in the light most favorable to the nonmoving party, reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." EEOC v. Townley Eng'g & Mfg. Co., 859 F.2d 610, 613 (9th Cir.1988), cert. denied, 489 U.S. 1077 (1989).
 
 
 24
 Primark contends that the district court did not have subject matter jurisdiction over the instant case pursuant to 28 U.S.C. Sec. 1471 (which was superseded in 1984 by 28 U.S.C. Secs. 157,[3] 1334[4]) because this case is not "related to" the administration of the bankruptcy estate or to the rights of the creditors of the estate.
 
 
 25
 Federal subject matter jurisdiction must exist at the time the action is commenced and is determined on the basis of the allegations made in the complaint. Morongo Band of Mission Indians v. Calif. State Board of Equalization, 858 F.2d 1376, 1380 (9th Cir.1988).
 
 
 26
 In its complaint, Vicron pleaded that "[t]his case involves, inter alia, claims for relief to deny dischargeability of certain debts of Defendant Wellcorp International, Inc., Debtor herein, pursuant to 11 U.S.C. Sec. 523." The complaint also alleges jurisdiction pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sec. 1961 et seq.
 
 
 27
 A proceeding is "related to" bankruptcy, in accordance with 28 U.S.C. Sec. 1334, if "the outcome of the proceeding could conceivably have any affect on the estate being administered in bankruptcy." In re Fietz, 852 F.2d 455, 457 (9th Cir.1988) ( quoting Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir.1984) (emphasis in original).
 
 
 28
 The determination of the dischargeability of Wellcorp's debt to Vicron was unrelated to Vicron's claims against Primark since the resolution of the claims against Primark would not have affected Wellcorp's bankruptcy estate.
 
 
 29
 Even though there was no jurisdiction pursuant to the bankruptcy laws, however, Vicron also asserted federal jurisdiction under RICO. Specifically, Vicron alleged that Primark, Wellcorp and other actors "engaged in a pattern of more than two separate and distinct acts of racketeering activity." Such a claim was supported by the allegations made in the complaint. This is enough to confer jurisdiction over Primark, even though Vicron ultimately was not able to prove a RICO violation.
 
 
 30
 When the district court dismissed the RICO claim prior to trial, it had discretion to retain and grant relief on the common law fraud claim under the doctrine of supplemental jurisdiction. 28 U.S.C. Sec. 1367(c)(3). The district court expressly decided to exercise its jurisdiction over Primark. Such an exercise was proper.
 
 III.
 
 31
 In order to succeed on a claim for common law fraud under Nevada law, a plaintiff must establish each of the following elements by clear and convincing evidence:
 
 
 32
 1. A false representation made by defendant;
 
 
 33
 2. Defendant's knowledge or belief that the representation is false;
 
 
 34
 3. Defendant's intention to induce the plaintiff to act or to refrain from acting in reliance upon the misrepresentation;
 
 
 35
 4. Plaintiff's justifiable reliance on the misrepresentation;
 
 
 36
 5. Damage to the plaintiff resulting from such reliance. Bulbman Inc. v. Nevada Bell, 825 P.2d 588, 592 (Nev.1992).
 
 A.
 
 37
 Vicron's entire case hinges on the telephone conversation in August, 1988 between Laurel Bigelow and an unknown person who said he was from Primark. The phone conversation is the only link between Primark and Vicron before the signing of the Agreement. Without it, Vicron has no basis for its claim that it was induced by Primark into signing the Agreement. Vicron must base its case for fraud against Primark only on acts or omissions committed by Primark.
 
 
 38
 Until the time of the phone conversation, Vicron had had no contact with any Primark representative, as far as it knew. The phone conversation occurred during a meeting between Roberts and Bigelow in Mill Valley, California in August, 1988. The three met to discuss possible ways by which Wellcorp could purchase Vicron's assets. Broes asked Bigelow whether he wanted to verify Primark's investment. When Bigelow replied that he did, Broes dialed a phone number that Bigelow did not see and handed the receiver to Bigelow. The person on the other line stated that he was from Primark, that Primark was going to make a two or three phase investment in Wellcorp, and that Broes was Primark's agent and would make the decisions. By this phone conversation, Vicron claims that all representations made by Broes are attributable to Primark.
 
 
 39
 Bigelow testified that he did not dial the phone, did not know what phone number Broes had dialed, and did not know the name of the person with whom he spoke. Bigelow merely "assumed" it was Mr. Kasputys, Primark's president. The record reflects no other evidence that was presented by Vicron to indicate that a telephone call was made to Primark.
 
 
 40
 There is no evidence that the phone call was made to Primark or that it was a Primark representative who made the statements to Bigelow. Although the phone conversation was relevant evidence against Wellcorp and Broes, it could not be used as evidence against Primark.
 
 
 41
 Consequently, no evidence was presented to establish that Broes was Primark's agent or that there was any contact between Primark and Vicron before the Agreement was signed on September 17, 1988.
 
 
 42
 The district court was correct in granting Primark's motion for judgment as a matter of law. Since the evidence that Broes was Primark's agent was not competent and since there was no evidence of any other contact between Primark and Vicron before September 17, 1988, no representations could have been made to Vicron by Primark upon which Vicron could base a fraud claim.
 
 B.
 
 43
 Vicron also must show that its reliance on Primark's alleged misrepresentations was justifiable. Here Vicron again fails to meet its burden.
 
 
 44
 At trial, it was shown that Vicron did not conduct a due diligence investigation of Primark other than an inspection of Standard and Poors at the local library. Vicron did not investigate Wellcorp, although many of Wellcorp's financial statements were available for public viewing. Vicron was satisfied with a phone call from an unknown person for verification of Primark's funding. Vicron never demanded written verification of the additional funding, and chose to execute the Agreement without having received any written verification.
 
 
 45
 There was no mention in the Agreement that Primark would fund Wellcorp and no evidence was presented by Vicron indicating that anyone believed that the Agreement was not complete and integrated. Nothing in the Agreement indicates that the Agreement was contingent upon appropriate funding.
 
 
 46
 Vicron argues that the longstanding business relationship with Broes and the fact that the misrepresentations had begun long before the signing of the Agreement made its reliance justifiable.
 
 
 47
 Vicron never inquired about the terms of the investment that Wellcorp was to receive. So negligent was Vicron in determining the nature of Primark's investment that Vicron did not even know that the initial investment by Primark was going to be in the form of a loan.
 
 
 48
 No reasonable jury could have found, by clear and convincing evidence, that Vicron's reliance on unverified statements about an investment of unspecified terms by an unknown person about an unfamiliar company was justifiable.
 
 
 49
 The district court was correct in concluding that no reasonable jury could have found for Vicron on its common law fraud claim. First, there was no competent evidence that Primark made any representations, false or not, to Vicron before the Agreement was signed. Second, Vicron's reliance was not justifiable, since Vicron failed to conduct even a minimal inquiry into the operations of Wellcorp and Primark or the terms of the "investment" by Primark. Thus, the district court was correct when it entered judgment as a matter of law against Vicron.
 
 IV.
 
 50
 The Court notes with displeasure appellant's counsel's careless presentation of the facts in this case to the Court. The Court was obliged to devote significant time and effort to examining the record, which would not have been necessary absent counsel's improper behavior. The Court admonishes counsel to refrain from such actions in the future.
 
 
 51
 AFFIRMED.
 
 
 
 *
 The Honorable J. Spencer Letts, United States District Judge for the Central District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [3]
 28 U.S.C. Sec. 157 (1993) gives the district court the authority to refer "any or all proceedings arising under title 11 or arising in or related to a case under title 11."
 
 
 [4]
 28 U.S.C. Sec. 1334 (1993) states:
 (a) Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11.
 (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11....
 (d) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, or the debtor as of the commencement of such case, and of property of the estate.