# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHARLES EDWARD BYRD,
            *Plaintiff-Appellant,*

            v.

MARICOPA COUNTY SHERIFF'S
DEPARTMENT; JOSEPH M. ARPAIO;
KATHLEEN O'CONNELL; AUSTIN
PETERSON; DURANGO JAIL,
            *Defendants-Appellees.*

No. 07-16640

D.C. No.
CV-04-02701-NVW

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
October 2, 2008—Pasadena, California

Filed May 18, 2009

Before: Ferdinand F. Fernandez, Consuelo M. Callahan, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Partial Concurrence and Partial Dissent by Judge Fernandez

5903

## COUNSEL

Jarrett A. Green, Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, California, pro bono counsel for the appellant.

Maria R. Brandon, Maricopa County Attorney's Office, Phoenix, Arizona, counsel for the appellee.

**OPINION**

IKUTA, Circuit Judge:

Charles Byrd, a former pretrial detainee in the minimum-security Durango Jail in Maricopa County, Arizona, brought this action under 42 U.S.C. § 1983 against Maricopa County Sheriff Joseph Arpaio in his personal and official capacities, Kathleen O'Connell, a former cadet at the Maricopa County Sheriff's Office Training Academy, and Captain Austin Peterson, O'Connell's supervisor.[1] Byrd contends that a search of his housing unit, during which a partial strip search and pat down of his groin area was conducted by a female training cadet despite the availability of male detention officers nearby, violated his constitutional rights. The district court dismissed Byrd's equal protection claim and granted judgment as a matter of law against Byrd on aspects of his Fourteenth and Fourth Amendment claims. After a jury resolved certain factual disputes relating to the search, the district court entered judgment in favor of all defendants. Given the facts and procedural posture of this case, we affirm the judgment of the district court.

I

A

Byrd was a pretrial detainee at minimum-security Durango Jail in Maricopa County, Arizona. In October 2004, there had been multiple fights in Byrd's housing unit, and officials suspected that contraband was circulating in the jail. In order to

---

[1] We construe Byrd's complaint against Arpaio in his official capacity as a suit against Maricopa County. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *see also Ctr. for Bio-Ethical Reform v. Los Angeles County Sheriff Dept.*, 533 F.3d 780, 786 (9th Cir. 2008) (official capacity suit against county sheriff was equivalent to suit against county). We refer to individual defendants by name when appropriate, and otherwise refer to defendants collectively as "County."

conduct a coordinated search of Byrd's entire housing unit, jail supervisors requested assistance from the Maricopa County Sheriff's Office Training Academy (Academy) cadets. On October 28, jail officers carrying taser and pepper guns entered Byrd's cell and ordered him to remove all his clothing except his boxer shorts, which were made of thin material. The officers ordered Byrd to walk into an open common area known as the "day room," where 25 to 30 Academy cadets and 10 to 15 uniformed detention officers were present. The cadets wore jeans and white T-shirts with their last names printed on the back in black lettering. Approximately one third of both the cadets and officers in the room were female. At least one person with a hand-held camera was present in the day room.

Jail officials directed five or six inmates at a time to stand in front of a row of waiting cadets in order to be searched. When it was Byrd's turn, the officers ordered Byrd to walk over to the cadets, stand facing away from them, raise his arms above his head, and spread his legs. O'Connell approached Byrd from behind and conducted the search as follows: She ran her hands across the waistband of Byrd's boxer shorts and pulled the waistband out a few inches to check for anything hidden or taped inside; she did not look into his boxer shorts. She lightly frisked over his boxer shorts and down the outside of his thigh, stopping at the bottom of the shorts. Through the boxer shorts, O'Connell moved Byrd's scrotum and penis with the back of her hand in order to frisk his groin, applying light pressure to feel for contraband. She then placed her hand at the bottom of his buttocks, ran it upward over his boxers, and separated the cheeks to search for any contraband taped, placed, or hidden inside.[2]

---

[2]Although the parties dispute whether this search constituted a "strip search," we have referred to a search as a "pat down and partial strip search," and simply as a "strip search," when a suspect was stripped to her underwear and officers felt the suspect's groin area through the underwear. *United States v. Gonzalez-Rincon*, 36 F.3d 859, 861 (9th Cir. 1994). Because Byrd was not completely unclothed, but was in his boxer shorts and the search physically explored his genital region, we will refer to the search as a "pat down and partial strip search" or, for the sake of brevity and convenience, a "strip search."

The record indicates the search of Byrd was brief. O'Connell demonstrated the search to the jury and testified that it lasted between 10 and 20 seconds, while Byrd testified that it lasted 60 seconds.

Under the County's policies and customs, female officers and cadets are not permitted to observe or conduct cross-gender strip searches if all of an inmate's clothing has been removed. They are, however, permitted to observe and conduct searches, whether visual or tactile, if an inmate is wearing underwear, which at Maricopa County's detention facilities are standard-issue boxer shorts. Females are not permitted to look into a male inmate's underwear when conducting a pat down and partial strip search.

B

After the search, Byrd filed an inmate grievance form with the Maricopa County Sheriff's office. He subsequently filed additional grievances with the County, none of which resulted in remedial action. Byrd filed a pro se complaint in district court on November 26, 2004, and amended it June 14, 2005, alleging that the search violated: (1) his Fourth Amendment right to be free from unreasonable searches; (2) his substantive due process right to be free from punishment;[3] and (3) his Fourteenth Amendment right to equal protection of the laws.

---

[3]Byrd's pro se complaint alleged that his Eighth Amendment rights had been violated. Because at the time of the search Byrd was a pretrial detainee, the district court correctly recharacterized this claim as one alleging that the County violated Byrd's substantive due process rights under the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979) ("The Court of Appeals properly relied on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees. Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be "cruel and unusual" under the Eighth Amendment."). We refer to this claim as a Fourteenth Amendment substantive due process claim throughout.

Byrd alleged that his Fourth Amendment and substantive due process rights were violated because O'Connell caused "wanton and unnecessary infliction of pain" when she "grabbed his genitals twice, then ram[m]ed her index finger through the crack of his butto[cks]." He also alleged that there was no need for a female cadet to touch him because there were more than ten male detention officers present who could have performed the search. In addition, he claimed that jail officials were aware of, but deliberately indifferent to, the psychological pain that a cross-gender body search was likely to cause. Byrd alleged that the search caused him "public humiliation" and "psychological trauma," among other injuries.

The County moved for summary judgment, arguing that "Officer O'Connell conducted the frisk (body) search of Plaintiff in accordance with MCSO policy DH-3; in the presence of her supervisor, Captain Peterson; and in the process demonstrated and instructed detention officers in the proper manner in which to conduct such a search for contraband."

The district court issued an order dismissing part of the complaint, and granting in part and denying in part the County's motion for summary judgment. Under its obligation to dismiss sua sponte certain complaints brought by prisoners proceeding in forma pauperis, *see* 28 U.S.C. § 1915(e)(2)(B), and certain claims regarding conditions of confinement, *see* 42 U.S.C. § 1997e(c), the district court dismissed Count II, which had alleged an equal protection violation, for failure to state a claim.

The district court denied the County's motion for summary judgment on Byrd's Fourth Amendment and Fourteenth Amendment substantive due process claims.[4] The court held

---

[4]The district court also granted the County's motion in part, holding that under 42 U.S.C. § 1997e(e), Byrd could not recover for mental or emotional harm, but he could recover compensatory, nominal, and punitive damages premised on a violation of his Fourth Amendment and substantive due process rights, to the extent they were actionable. This holding is not at issue on appeal.

that the County was not entitled to summary judgment on Byrd's Fourth Amendment claim because it had not established that the search was "necessary to security or that it furthered a legitimate penological interest," and was not entitled to summary judgment on Byrd's substantive due process claim because it had not briefed the issue.

C

The district court appointed trial counsel for Byrd. While proceeding pro se, Byrd had made no discovery requests. When Byrd's newly appointed counsel learned that a person with a hand-held camera was present on the day in question, he asked the County to produce footage that may have been shot. The County initially stated it was unaware of any video recording of the search. Shortly before trial, however, O'Connell informed defense counsel that the Academy had given the cadets a Video Yearbook, which showed approximately one minute of footage from the day of the search. The County stated that it did not have the rest of the videotape footage, and that it assumed it had been destroyed pursuant to the County's retention policy. The Video Yearbook did not include any footage of Byrd or of O'Connell performing searches.

Byrd asked the court to exclude all references to the Video Yearbook on the grounds that the brief surviving footage did not show Byrd or O'Connell, and that it would be misleading and prejudicial because it highlighted the cadets in a favorable light. In the alternative, Byrd requested an adverse inference jury instruction that would state the videotape established that the search was done solely for training purposes, and that O'Connell groped Byrd's private parts. The district court reserved its decisions on whether to exclude the Video Yearbook, and on whether to give the requested instruction, pending the evidence produced at trial.

At trial, Byrd's counsel questioned Sheriff Arpaio about the video footage. The district court held that this opened the door

to the introduction of the Video Yearbook. Both the County and Byrd subsequently showed the video to the jury.

At the conclusion of testimony, both parties moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure.[5] The district court granted judgment as a matter of law in favor of Captain Peterson (O'Connell's supervisor) on the ground that he did not have any role at Durango Jail at the time of the search. Byrd does not challenge this ruling on appeal.

Next, because Byrd had not presented any evidence that Arpaio had instituted an unconstitutional policy (i.e., a policy of conducting searches for an unconstitutional purpose or in an unconstitutional manner), and there was no allegation that Arpaio had personally conducted or supervised the search, the district court held that Arpaio was entitled to judgment as a matter of law, notwithstanding the remaining factual disputes.

This left one remaining defendant, Cadet O'Connell. The district court concluded that the factual disputes over the purpose of the search and the manner in which it was conducted should be decided by the jury. The court held that if the jury found that the County had conducted the search for an identified security need, and if the jury found that O'Connell had not conducted the search in an inappropriate manner (i.e., by intentionally squeezing or kneading Byrd's penis or scrotum, or improperly touching his anus through his underwear), then

---

[5]Rule 50 provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).

the search would violate neither Byrd's substantive due process nor his Fourth Amendment rights as a matter of law. The court denied Byrd's cross motions for judgment as a matter of law.

In light of these rulings, the district court submitted three issues to the jury: (1) whether Byrd had proved that O'Connell "deprived him of his right against unreasonable search[es] by intentionally squeezing or kneading his penis or scrotum or improperly touching his anus through his underwear"; (2) whether O'Connell deprived Byrd of due process of law by taking any inappropriate actions during the search,[6] which actions had inflicted pain on Byrd, and which infliction was wanton; and (3) whether O'Connell violated Byrd's right against unreasonable searches "by conducting a search not done for [an] identified security need." The district court instructed the jury that it could draw an inference adverse to a party who destroyed evidence, but declined to give the instruction proposed by Byrd's counsel.

The jury found against Byrd on each of the issues, and the court entered judgment for all defendants. This timely appeal followed. On appeal, Byrd challenges the district court's dismissal of his equal protection claim, certain evidentiary rulings, and its grant of judgment as a matter of law in favor of Arpaio and O'Connell as to the constitutionality of the search.[7]

## II

**[1]** We first address whether the district court erred in its

---

[6]As in the first issue, the jury was instructed to determine whether "O'Connell intentionally squeezed or kneaded [Byrd's] penis or scrotum or improperly touched his anus through his underwear."

[7]We reject the County's assertion that the issues on appeal are limited by rules governing in forma pauperis proceedings. *See* 28 U.S.C. § 1915. Byrd did not proceed in forma pauperis in bringing his appeal, and this court's records reflect that all appropriate fees have been paid.

sua sponte dismissal under 28 U.S.C. § 1915(e) of Byrd's equal protection claim. The Prison Litigation Reform Act states that "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action or appeal . . . fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii). We review de novo a district court's decision to dismiss for failure to state a claim under 28 U.S.C. § 1915(e). *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (order). "Factual allegations in the complaint are taken as true and all reasonable inferences are drawn in the plaintiff's favor." *Barrett v. Belleque*, 544 F.3d 1060, 1061 (9th Cir. 2008) (per curiam).

In dismissing Count II, the district court held that Byrd had "failed to allege that he is a member of a suspect class," and that Byrd "had neither alleged nor demonstrated that Defendants' conduct was the result of purposeful or invidious discrimination, or that the conduct bore no rational relationship to a legitimate government interest."

**[2]** We have held that "§ 1983 claims based on Equal Protection violations must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1026 (9th Cir. 1998). Even construing Byrd's pro se complaint liberally, *see Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987), it fails to allege facts susceptible to an inference that "defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class," *Barren*, 152 F.3d at 1194. While Byrd alleged that a female searched him, he fatally "failed to allege that defendants' acts or omissions were motivated by discriminatory animus toward" male prisoners. *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001); *see also Rosenbaum v. City & County of San Francisco*, 484 F.3d 1142, 1152-53 (9th Cir. 2007). Accordingly, the district court did not err in dismissing Count II of the complaint.

## III

We next address Byrd's challenges to the district court's evidentiary rulings. We review a district court's evidentiary decisions, which include whether and how to sanction parties for destruction of evidence, for an abuse of discretion. *Med. Lab. Mgmt. Consultants v. Am. Broad. Co.*, 306 F.3d 806, 824 (9th Cir. 2002). In addition to showing the district court abused its discretion, "the appellant is . . . required to establish that the error was prejudicial." *Tritchler v. County of Lake*, 358 F.3d 1150, 1155 (9th Cir. 2004). We will reverse the district court only if an erroneous ruling "more likely than not affected the verdict." *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004) (internal quotation marks omitted). Byrd challenges the district court's decision to admit the Video Yearbook into evidence, as well as its refusal to give his proposed adverse inference jury instruction regarding the County's alleged destruction of the unedited footage. We consider these issues in turn.

## A

First, Byrd argues the district court erred by permitting the County to introduce the Video Yearbook. According to Byrd, the video was irrelevant because it does not include footage of O'Connell searching Byrd, or indeed, of O'Connell conducting any of the searches she performed that day. Moreover, Byrd argues that the video was prejudicial because it presented the cadets in a highly flattering light. Finally, Byrd asserts that the Video Yearbook was misleading because searches depicted in the video showed cadets performing fully clothed searches on their supervisors, rather than the search of Byrd in his underwear. Byrd contends that the prejudicial and misleading effect of the video outweighs its limited or non-existent probative value, and therefore, the district court abused its discretion by allowing it to be shown to the jury.

**[3]** We disagree. Evidence that is otherwise admissible may be excluded if "its probative value is substantially outweighed

by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. However, evidence that may have been otherwise excluded under Rule 403 may become admissible based on events at trial. "Under the rule of curative admissibility, or the 'opening the door' doctrine, the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission." *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988); *accord Jerden v. Amstutz*, 430 F.3d 1231, 1239 n.9 (9th Cir. 2005).

**[4]** At the pretrial hearing, after Byrd's counsel objected to the possible introduction of the Video Yearbook, the County indicated that it did not intend to offer the video as an exhibit unless Byrd's counsel opened the door by insinuating that the County videotaped the particular search of Byrd and then erased it. In his opening statement, Byrd's counsel indicated that the County's alleged destruction of the tape would be an issue at trial, stating, "You will learn that this training demonstration on Mr. Byrd was videotaped but that the portion of the tape has now been erased." During direct examination, the following exchange occurred between Arpaio and Byrd's counsel:

> Q: [B]eing in law enforcement, you would agree that officers must preserve all evidence which is critical to inmate's complaints.
>
> A: Yes.
>
> Q: And you would agree that it would be improper, actually illegal, to lose evidence to cover up wrongdoing; correct, sir?
>
> A: To cover up wrongdoing?

Q: Yes.

A: Yes.

Based on this line of questioning, the district court found that Byrd's counsel was laying the foundation for an instruction permitting the jury to infer that any missing evidence, namely, the complete video footage recorded that day, was damaging to the County. Therefore, the district court held that Byrd's counsel had opened the door for the County to show the Video Yearbook so the jury could determine whether the original video tape was likely or unlikely to contain what Byrd alleged. Byrd's counsel subsequently played the video during closing argument in an effort to prove the searches conducted on the day in question were for training purposes rather than security purposes.

[5] Because Byrd opened the door to the introduction of this evidence, the district court did not abuse its broad discretion in admitting the Video Yearbook as an exhibit. *See United States v. Segall*, 833 F.2d 144, 148 (9th Cir. 1987). The Video Yearbook was relevant to rebut Byrd's assertion in opening argument, and suggestion during Arpaio's direct examination, that the original tape depicted an abusive search and had been improperly edited or destroyed. Moreover, Byrd has not demonstrated that any unfair prejudice substantially outweighed the video's value, or that the verdict would have been any different absent the video.

B

Byrd next argues the district court erred in its formulation of an adverse inference instruction. Byrd requested that the district court provide the following instruction:

The Maricopa County Sheriff's Office video recorded academy class 813's search of the Durango Jail, Housing Unit 4, on October 28, 2004. On that

same day, Mr. Byrd filed a complaint with the Maricopa County Sheriff's Office alleging that a female cadet had sexually assaulted him. The Maricopa County Sheriff's Office erased the video footage of academy class 813's search of the Durango Jail, Housing Unit 4, despite actual notice of Mr. Byrd's claims and allegations. The Maricopa County Sheriff's Office's destruction of the footage demonstrates that the academy class's search was done solely for training purposes and that Ms. O'Connell grabbed Mr. Byrd's penis, scrotum and testicles, and inserted her finger into Mr. Byrd's anus. [altered to correct the spelling of "Sheriff"].

The district court agreed to give an adverse inference instruction, but provided the following to the jury:

A party who has timely notice of the assertion of a claim has a duty to take reasonable efforts to preserve evidence. If a party with such notice fails to preserve evidence through some fault of its own, you may draw an inference that the evidence not preserved would have been favorable to the opposing party.

**[6]** Byrd argues that this instruction is inadequate because it did not direct the jury to make an adverse inference against the County. We disagree. The district court's instruction accurately stated the law and was adequate to allow the jury to determine whether an adverse inference against the County was warranted. "A court is not required to use the exact words proposed by a party, incorporate every proposition of law suggested by counsel or amplify an instruction if the instructions as given allowed the jury to determine intelligently the issues presented." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1398 (9th Cir. 1984). Moreover, Byrd was not entitled to an instruction that directed the jury to reach a conclusion about matters of disputed fact. *Rob-*

*erts v. Spalding*, 783 F.2d 867, 873 (9th Cir. 1986). Because the district court found that the applicability of the adverse inference instruction turned on disputed facts, the court's decision to give the instruction in the abstract and allow the parties to argue to the jury whether the facts supported its application was not an abuse of the district court's broad discretion.

## IV

We next turn to Byrd's argument that the district court erred in granting judgment as a matter of law in favor of Arpaio and O'Connell. Byrd contends that, notwithstanding the jury's findings, the search, and in particular the cross-gender aspect of it, violated both his substantive due process right to be free from punishment and his Fourth Amendment right to be free from unreasonable searches.[8] "We review de novo an order granting or denying judgment as a matter of law." *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 755 (9th Cir. 2006) (internal quotation marks omitted). "In considering a motion under Rule 50 of the Federal Rules of Civil Procedure, we view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." *E.E.O.C. v. Pacific Maritime Ass'n*, 351 F.3d 1270, 1272 (9th Cir. 2003). Judgment as a matter of law "should be granted when the evidence permits only one reasonable conclusion as to the verdict. If conflicting inferences may be drawn from the facts, the case must go to the jury." *Redman v. County of San Diego*, 942 F.2d 1435, 1439 (9th

---

[8]The County contends that Byrd has waived any challenge to the specific search at issue here and is challenging only the County's general policy allowing cross-gender searches. We reject this argument. Byrd argued both before the district court and on appeal that the search conducted by O'Connell violated his constitutional rights, and he pursued a claim against Arpaio in both his individual and official capacities. We read Byrd's appeal as challenging both the search to which he was subjected and the alleged County policy which putatively caused it to occur. *See, e.g.*, *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Cir. 1991) (en banc) (internal quotation marks and citation omitted).

Our review is sharply circumscribed by *Bell v. Wolfish*, 441 U.S. 520 (1979), in which the Supreme Court upheld visual body cavity searches of pretrial detainees against their Fourth and Fourteenth Amendment challenges. Under *Bell*, when reviewing conditions and restrictions placed on prisoners and pretrial detainees, we must bear in mind the inherent difficulties in managing a detention facility, and that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions." *Id.* at 547. Judicial deference to prison officials is appropriate on the grounds that "the realities of running a corrections institution are complex and difficult, courts are ill equipped to deal with these problems, and the management of these facilities is confided to the Executive and Legislative Branches, not to the Judicial Branch." *Id.* at 548 n.29. Therefore, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 540 n.23 (internal quotation marks omitted).

In light of these principles, our task is to determine whether the district court erred in holding that, as a matter of law, neither Maricopa County nor the individual defendants (O'Connell and Arpaio in his individual capacity) violated Byrd's constitutional rights.[9] We must also undertake our review in light of the jury's factual determinations that the search was performed for an "identified security need," and that O'Connell did not search Byrd in an inappropriate manner. Byrd does not challenge these findings on appeal, and therefore we are bound by them.

---

[9]The defendants sued in their individual capacities did not assert qualified immunity in district court, and accordingly we do not consider the issue on appeal.

A

We first consider Byrd's argument that the search violated his substantive due process right to be free from punishment. Byrd contends the search at issue amounted to punishment because it was conducted by a woman despite the availability of men; he was not told that O'Connell was associated with the jail system; jail officials carried taser and pepper guns, cursed at him, and ordered him to remain silent; and a person with a hand-held camera was present. Moreover, Byrd states that he suffers from a history of sexual abuse, and therefore the cross-gender aspect of the search was particularly traumatic. Byrd asserts that the prison officials displayed deliberate indifference to the harm the search would cause him, both because any person would know that the circumstances of this search would cause shock, degradation, and pain, and because these consequences were easily preventable by having male officials who were standing nearby conduct the search.

[7] When the government holds a person in confinement as a pretrial detainee, it "may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment or otherwise violate the Constitution," *Bell*, 441 U.S. at 536-37, because "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law," *id.* at 535; *accord Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004). This standard is different from that applied to prisoners, "who may be subject to punishment so long as it does not violate the Eighth Amendment's bar against cruel and unusual punishment." *Pierce v. County of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008) (citing *Bell*, 441 U.S. at 535 n.16). "Because pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, however, we apply the same standards." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).

When prisoners challenge conditions or deprivations associated with their confinement, a court must consider the two components of an Eighth Amendment claim: (1) the objective component, which addresses whether the deprivation was sufficiently serious to constitute "cruel and unusual" punishment; and (2) the subjective component, which addresses whether the prison officials acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The Supreme Court explained that the latter intent requirement did not emanate from "the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual *punishment*. If the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify" as punitive. *Id.* at 300 (emphases in original).

**[8]** The same intent requirement is applicable in the pretrial detainee context: the Supreme Court has explained that whether a particular action or condition of confinement amounts to punishment turns on whether the action taken, or condition imposed, was accompanied by punitive intent. *See Bell*, 441 U.S. at 538-39.

Punitive intent may be proven in various ways. It is most obvious when an official expresses an intent to punish a detainee. *See id.* at 538. When there is no evidence "of an expressed intent to punish on the part of detention facility officials," punitive intent can be inferred. *Id.* If "a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 539; *see also Block v. Rutherford*, 468 U.S. 576, 584 (1984). When detention facility officials are personally accused of depriving incarcerated persons of "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), or exposing them to "conditions posing a substantial risk of serious harm," *Farmer*

*v. Brennan*, 511 U.S. 825, 834 (1994), punitive intent can be inferred from an officer's "deliberate indifference" to the harm caused. *See Seiter*, 501 U.S. at 302-03 (explaining the applicability of the deliberate indifference standard to prisoner cases); *Frost*, 152 F.3d at 1128 (explaining the applicability of the deliberate indifference standard to cases involving pretrial detainees). A detention facility official acts with "deliberate indifference" if "he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847; *accord Frost*, 152 F.3d at 1128. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

[9] Byrd has not alleged or adduced any evidence indicating that O'Connell or Arpaio expressed an intent to punish him. *See Bell*, 441 U.S. at 538. Therefore, in order to prevail on his substantive due process claim, Byrd must present evidence from which an inference of punitive intent may be drawn. *See id.* at 538-39; *Farmer*, 511 U.S. at 847. Byrd contends that we should draw such an inference in this case because the search in question is analogous to those we struck down in *Jordan v. Gardner*, 986 F.2d 1521 (9th Cir. 1993) (en banc).

In *Jordan*, a prison had instituted a policy requiring "male guards to conduct random, non-emergency, suspicionless clothed body searches on female prisoners." 986 F.2d at 1522 (footnote omitted). The searches were aggressive and intrusive:

> According to the prison training material, "a guard [was] to use a flat hand and pushing motion across the inmate's crotch area." The guard [was to] "push inward and upward when searching the crotch and upper thighs of the inmate." All seams in the leg and the crotch area [were] to be "squeezed and kneaded."

> Using the back of the hand, the guard also [was] to search the breast area in a sweeping motion, so that the breasts [would] be "flattened."

*Id.* at 1523 (alterations and internal citations omitted).

In evaluating whether the policy in *Jordan* violated the Eighth Amendment's ban on "unnecessary and wanton infliction of pain," we first considered the objective component of an Eighth Amendment claim by addressing whether the deprivation was sufficiently serious. We concluded that the district court's finding that the searches constituted the "infliction of pain" on the female inmates was not clearly erroneous, in light of substantial evidence that many of the female inmates had been violently sexually abused prior to their incarceration and were psychologically fragile, and that the cross-gender searches would cause some inmates substantial suffering. *Id.* at 1525-26. The evidence included extensive expert testimony from "staff members, social workers, psychologists, an anthropologist, and the former Director of Corrections for four different states at various times." *Id.* at 1526. One expert testified that "the unwilling submission to bodily contact with the breasts and genitals by men would likely leave the inmate 'revictimized,' resulting in a number of symptoms of post-traumatic stress disorder." *Id.* (alteration omitted). This evidence was corroborated by inmates' testimony, as well as evidence that one inmate who was searched "had to have her fingers pried loose from bars she had grabbed during the search, and she vomited after returning to her cell block." *Id.* at 1523.

We then considered the subjective component of an Eighth Amendment claim by addressing whether the prison officials had acted with "deliberate indifference." *Id.* at 1527. We concluded that they had, *id.* at 1530, basing this conclusion on evidence that the policymaker at the prison was aware of the risk of psychological trauma to the female inmates, but nevertheless proceeded with the implementation of the search pol-

icy, *id.* at 1528-29. Specifically, the prison policymaker "was urged by members of his own staff not to institute cross-gender clothed body searches due to the psychological trauma which many inmates likely would suffer." *Id.* at 1528. In addition, a court order was required to stop the practice "although one of the first inmates to be searched suffered a severe reaction." *Id.* at 1528-29. We also held that the search policy was "unnecessary" because the facility's "security [was] not dependent upon" cross-gender searches; nor did the searches "ensure equal employment opportunities for male guards." *Id.* at 1526-27.

**[10]** Applying the *Jordan* framework here, the prison officials did not have the mental state necessary for their actions to constitute punishment. Taking the evidence and all inferences in the light most favorable to Byrd, *see Redman*, 942 F.2d at 1439, there is no evidence in the record that would allow a rational jury to conclude that either O'Connell or Arpaio knew the cross-gender aspect of the search would cause Byrd harm, or that either of them "disregard[ed] that risk by failing to take reasonable measures to abate it," *Farmer*, 511 U.S. at 847. Arpaio testified that in over 15 years, there had never been a problem with a male being searched by a female, and the record does not show otherwise. Byrd did not indicate to anyone at the jail before or during the search that he had a history of sexual abuse, and there is no evidence that anyone at the jail was aware of this history. Moreover, O'Connell testified that she had searched a "couple hundred" men in the same manner, and no man had ever adversely reacted to a search. Therefore, Byrd has not shown that either O'Connell or Arpaio acted with deliberate indifference in conducting the search.

Finally (and as discussed in more detail *infra* pp. 5934-37), because the search was reasonably related to the County's legitimate security needs, as found by the jury, and because the County had a legitimate operational basis for permitting

cross-gender searches, we cannot infer that the purpose of the search was punitive. *Bell*, 441 U.S. at 561.

**[11]** Because the search was reasonably related to legitimate governmental needs, and because Byrd has pointed to no evidence from which a rational jury could conclude that it was conducted with "deliberate indifference" to pain the cross-gender aspect of the search might cause, it did not constitute punishment. Therefore we must conclude that neither Arpaio nor O'Connell violated Byrd's substantive due process rights. *Cf. Jordan*, 986 F.2d at 1527-30. Accordingly, we need not consider the objective component of Byrd's claim (the degree of deprivation or harm), or whether a pretrial detainee may be able to bring a Fourteenth Amendment substantive due process claim based on evidence of a less severe deprivation or harm than would be necessary to establish an Eighth Amendment "cruel and unusual" punishment claim. *See id.* at 1525-26.

**[12]** Because Byrd has suffered no substantive due process deprivation, his claim against Maricopa County necessarily fails. Byrd has not alleged that any action apart from the cross-gender search performed by O'Connell violated his substantive due process rights, and "[n]either a municipality nor a supervisor . . . can be held liable under § 1983 where no injury or constitutional violation has occurred." *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Quintanilla v. City of Downey*, 84 F.3d 353, 356 (9th Cir. 1996); *cf. Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) (per curiam) (holding that a city may be liable under § 1983 even when individual officials are exonerated, if a constitutional deprivation was attributable to city action or inaction). We therefore affirm the district court's grant of judgment as a matter of law to Arpaio and O'Connell on Byrd's substantive due process claim.

B

We next turn to the question whether the district court erred in holding that the search was reasonable under the Fourth Amendment as a matter of law, notwithstanding its cross-gender aspect. Again, we are bound by the jury's unchallenged findings that the search in question was for security purposes and that O'Connell did not conduct it inappropriately.[10] We take all other evidence and the inferences therefrom in the light most favorable to Byrd. *See Redman*, 942 F.2d at 1439. However, "we must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities." *Beard v. Banks*, 548 U.S. 521, 530 (2006) (plurality op.); *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). As noted above, this is due in part to the "difficulty of operating a detention facility safely, [and] the seriousness of the risk of smuggled weapons and contraband." *Way v. County of Ventura*, 445 F.3d 1157, 1161 (9th Cir. 2006); *see also Bell*, 441 U.S. at 548 n.29.

We agree with Byrd's contention that we must analyze his claim in light of both *Turner v. Safley*, 482 U.S. 78 (1987) and *Bell*. The Supreme Court in *Bell* assumed, without deciding, that pretrial detainees retain Fourth Amendment rights, 441 U.S. at 558, but subsequently held in *Hudson v. Palmer* that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." 468 U.S. 517, 526 (1984). We have held that the Fourth Amendment does apply to the invasion of bodily privacy in prisons, but the "reasonableness of a particular search is determined by reference to the prison context." *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988). The government "may restrict or withdraw rights to the extent necessary to fur-

---

[10]To avoid confusion, we reiterate that the district court's Rule 50 holding was contingent upon the jury finding that O'Connell did not perform the search inappropriately and that it was performed for a security reason.

ther the correctional system's legitimate goals and policies." *Grummet v. Rushen*, 779 F.2d 491, 493 (9th Cir. 1985).

**[13]** In considering Fourth Amendment claims, *Bell* mandates a "test of reasonableness," which "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." 441 U.S. at 559. In evaluating Fourth Amendment claims brought by incarcerated persons, *Bell* directs us to consider: (1) "the scope of the particular intrusion"; (2) "the manner in which it is conducted"; (3) "the justification for initiating it"; and (4) "the place in which it is conducted." *Id.* In *Turner*, the Court provided more guidance regarding *Bell*'s reasonableness standard, holding that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. The Court set forth several factors as being "relevant in determining the reasonableness" of a prison regulation or practice: (1) "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," which, if the impact is substantial, requires particular deference to corrections officials; and (4) "the absence of ready alternatives" as evidence of the reasonableness of a prison regulation, or "the existence of obvious, easy alternatives" as evidence that the regulation "is an 'exaggerated response' to prison concerns." *Id.* at 89-91 (internal citations and quotation marks omitted).

There are limits to the applicability of the reasonableness factors outlined in *Turner*. We have not applied *Turner* to a pretrial detainee's Fourteenth Amendment claim of punishment, *see Demery*, 378 F.3d at 1028, and *Turner* is not applicable to all prisoner challenges based on a deprivation of constitutional rights, *see Johnson v. California*, 543 U.S. 499,

510-11 (2005) (declining to apply *Turner* to the right not to be discriminated against on the basis of race and indicating it may not be applicable to Eighth Amendment claims of cruel and unusual punishment). However, *Turner* is applicable to "rights that are inconsistent with proper incarceration," *Johnson*, 543 U.S. at 510 (internal quotation marks omitted), and "courts have applied the *Turner* test to prisoners' Fourth Amendment claims," *Thompson v. Souza*, 111 F.3d 694, 699 (9th Cir. 1997); *see also Michenfelder*, 860 F.2d at 332-33. Additionally, we have applied *Turner* to prisoners' challenges arguing that cross-gender strip searches violated their right to privacy. *Michenfelder*, 860 F.2d at 333-34.

**[14]** Logically, a pretrial detainee is entitled, at a minimum, to the same protection of constitutional rights as would be available to a convicted inmate under the *Turner* framework. *Bell*, 441 U.S. at 545 ("[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners."); *see also Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986). Therefore, although *Turner* considered only the rights of convicted prisoners, its framework is relevant to analyzing the constitutional rights of pretrial detainees, and we have looked to it in the past. *See Pierce*, 526 F.3d at 1209 (analyzing religious freedom rights of pretrial detainees under *Turner*); *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999) (en banc) (analyzing First Amendment rights of pretrial detainees under *Turner*).

For these reasons, in reviewing the reasonableness of a search, we are guided by *Turner*'s direction to consider whether the challenged conduct was "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89; *see also Thompson*, 111 F.3d at 699-700 (applying *Turner* and *Bell* to Fourth Amendment claim). In evaluating whether the search meets this test, we are mindful of the "scope of the particular intrusion, the manner in which it is conducted, the jus-

tification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559.

[15] Beginning with the first factor of *Turner*'s reasonable-relation test, the jury found that the search was done for an identified security need. There is no dispute that the County's security-related need to respond to reports of contraband and fighting in Byrd's housing unit is a "legitimate governmental interest," or that the reports of contraband and fighting are rationally connected to, and a valid justification for, conducting the pat down and partial strip searches. 482 U.S. at 89; *see also Bell*, 441 U.S. at 546-47 ("Central to all other correction goals is the institutional consideration of internal security within the corrections facilities themselves." (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974) (alteration omitted))).[11]

[16] Moving to the *Bell* factors, the scope of the search was reasonable given the County's suspicion of contraband circulating in the jail, and inmates' ability to conceal contraband in private areas. In *Bell*, the Court held that visual body cavity searches were justified by the detention facility officials' need to detect contraband and maintain security, even though there had been only one incident of attempted contraband smuggling. 441 U.S. at 559. We have upheld similar searches of incarcerated persons against constitutional challenges. *See Rickman v. Avaniti*, 854 F.2d 327, 328 (9th Cir. 1988) (approving same-gender strip searches conducted in cells of prisoners housed in administrative segregation prior to leaving cell); *see also Thompson*, 111 F.3d at 701 (holding same-gender body-cavity search did not violate clearly established rights). Nor did the place of the search make it unreasonable.

---

[11]The second *Turner* factor, "whether there are alternative means of exercising the right that remain open to prison inmates," 482 U.S. at 90, is not applicable in the Fourth Amendment context, because the right to be free from unreasonable searches is not a right susceptible to exercise by alternative means, *see Thompson*, 111 F.3d at 699; *Michenfelder*, 860 F.2d at 331 n.1.

We have upheld strip searches even when they took place in view of others, in light of institutional needs and realities. *See Thompson*, 111 F.3d at 701 (rejecting argument that same-gender strip search and visual body cavity search should have been conducted out of view of other prisoners who were laughing or whistling); *Michenfelder*, 860 F.2d 328 (upholding prison's same-gender visual body cavity searches whenever an inmate left or returned to the maximum security unit, notwithstanding fact that strip searches were conducted at the end of a hallway).

[17] The manner of this search requires closer scrutiny, however, because Byrd alleges the cross-gender aspect of the search makes it unreasonable. We have recognized that the "desire to shield one's unclothed figure[ ] from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963); *see also Michenfelder*, 860 F.2d at 334 (stating that this court recognizes "that incarcerated prisoners retain a limited right to bodily privacy" in the context of being viewed by members of the opposite sex); *Grummet*, 779 F.2d at 494 (same). Yet, while we have not foreclosed the possibility that a cross-gender search could violate an incarcerated person's constitutional rights, we have noted that "our prior case law suggests that prisoners' legitimate expectations of bodily privacy from persons of the opposite sex are extremely limited." *Jordan*, 986 F.2d at 1524. We have never held that a cross-gender search in a prison setting violated an inmate's Fourth Amendment rights. *See Grummet*, 779 F.2d at 496; *Jordan*, 986 F.2d at 1524; *cf. Somers v. Thurman*, 109 F.3d 614, 620 (9th Cir. 1997) (in context of qualified immunity, holding right to be free of cross-gender searches not clearly established). Rather, we have upheld cross-gender visual observations and body searches in certain circumstances.

[18] In *Grummet*, we upheld a policy permitting female officers to conduct pat-down searches of male prisoners when

the searches were "done briefly"; "in a professional manner and with respect for the inmates"; and performed on inmates who were "fully clothed, and thus [did] not involve intimate contact with the inmates' bodies." 779 F.2d at 496. The prison did not require female officers to "conduct or observe strip or body cavity searches" except in emergencies. *Id.* We additionally upheld a policy when women were assigned to positions requiring "infrequent and casual observation" of unclothed male prisoners in their cells and while showering. *Id.* at 494. We noted that preventing females from working in positions that would require occasional invasions of inmates' privacy "would necessitate a tremendous rearrangement of work schedules, and possibly produce a risk to both internal security needs and equal employment opportunities for the female guards." *Id.* at 496. Under these circumstances, we concluded that "the inmates have not demonstrated that these restricted observations by members of the opposite sex are so degrading as to require intervention by this court," *id.* at 495, or that the searches were "so offensive as to be unreasonable under the fourth amendment," *id.* at 496.

[19] In *Michenfelder*, we rejected a prisoner's argument that a prison invaded his right to privacy due to a policy permitting the presence of female officers during visual body cavity searches in hallways, and permitting females to work in positions that allowed observation of unclothed male inmates. 860 F.2d at 334. In determining whether the policies were reasonably related to legitimate penological interests, we "recognize[d] as legitimate both the interest in providing equal employment opportunities and the security interest in deploying available staff effectively." *Id.* We upheld the strip-search policy because female officers were not "routinely present for [the] strip searches" and did not "regularly or frequently observe unclothed inmates without a legitimate reason for doing so." *Id.* We also upheld females' placement in positions that included "shower duty," because female officers' presence "did not establish an inappropriate amount of contact with disrobed prisoners." *Id.* We reasoned, in part,

that "[p]rohibiting female employees from working" in areas that allowed observation of unclothed inmates, or "requiring [female employees] to be replaced by males for the duration of strip searches, would displace officers throughout the prison." *Id.* (stating that the "third *Turner v. Safley* factor has special relevance here").

Byrd argues the search in question is distinguishable from those we upheld in *Michenfelder* and *Grummet*. He contends the cross-gender aspect of the specific search at issue was not reasonable, but rather was an " 'exaggerated response' to prison concerns," *Turner*, 482 U.S. at 90, because of the invasiveness of the search and the ready availability of male officials to conduct it. Because the male officials were immediately available, he asserts there would have been no impact on the jail's allocation of resources or on its procedure for meeting security needs if a male, rather than a female, had searched him. Byrd further argues that the cross-gender element of the search was not justified by the County's need to provide equal employment opportunities to female prison officials. He cites testimony from County witnesses that they were not aware of any incident in which a female officer's employment opportunities were hampered as a result of accommodations to protect the privacy interests of male detainees.

**[20]** Even taking all facts and inferences therefrom in Byrd's favor, however, we cannot conclude that the manner of the search was unreasonable, or constituted an "exaggerated or excessive means to enforce security." *Thompson*, 111 F.3d at 700 (internal quotation marks omitted). As noted, the jury found that the search was not done in an inappropriate manner. The record indicates that O'Connell wore gloves at all times, and conducted the search professionally and swiftly, finishing in, at most, 60 seconds. The invasion of Byrd's bodily privacy in this case does not substantially exceed the cross-gender observations and searches we upheld in *Michenfelder* and *Grummet*. Moreover, the County has provided a

legitimate justification for the cross-gender aspect of the search: the County adduced undisputed evidence that the cross-gender search was justified by its legitimate security and staffing needs, focusing primarily on the shortage of adequate personnel. Captain Peterson testified that the County did not have sufficient numbers of male detention officers to conduct searches of male inmates, as required to meet safety and security needs, without the assistance of female officers. Further, Peterson testified that the County was not able to obtain a greater number of male officers for these searches because it had difficulties hiring adequate staff, and because it could not pull male officers from other jail facilities. Cadets, including females, were regularly called to assist in mass searches "because of [the need for] additional manpower, and we have no other place to get it from except" from the Academy. We have held that the County has a legitimate "security interest in deploying available staff effectively." *Michenfelder*, 860 F.2d at 334. Accordingly, we cannot conclude that the cross-gender search lacked a "valid, rational connection" to the County's legitimate justifications. *Turner*, 482 U.S. at 89.

Turning to the impact that accommodation of Byrd's Fourth Amendment rights would have "on the allocation of prison resources generally," *id.* at 90, Byrd contends that the search was an " 'exaggerated response' to prison concerns" because the presence of male officials at the search provided "an alternative that fully accommodates the prisoner's right at *de minimis* cost to valid penological interests," *id.* at 90-91. This argument goes too far. A detention facility that hires both male and female officers to meet its staffing needs will regularly have male officers, as well as female officers, available at searches. The determination sought by Byrd, that it is per se unreasonable for a female officer to conduct searches of male inmates when male officers are also present, would significantly limit the usefulness of female officers for meeting a detention facility's security needs. In this case, such a determination would be inconsistent with the County's

approach to staffing and deploying its officers, and contrary to the County's uncontradicted testimony that it has inadequate male staff to meet its security needs, and must therefore use both male and female officials to conduct searches on male inmates.

**[21]** Moreover, the County has already made a determination regarding when it can reasonably accommodate cross-gender concerns: its policies prohibit cross-gender observation and administration of unclothed strip and body cavity searches, and its policies prohibit visual inspection of inmates' genitalia during a cross-gender pat down and partial strip search. In light of the jury's findings, and the "wide-ranging deference" we owe to the County's professional judgment on these operational issues, *Bell*, 441 U.S. at 547, we conclude that the cross-gender search in question was not an exaggerated response to prison concerns.

We emphasize that the question whether the district court erred in granting the County's motion for judgment as a matter of law is close. We are troubled by the overall circumstances of the search in question. The scope of the search was invasive in that it involved contact with Byrd's genital region, albeit through his boxer shorts. The embarrassment inherent in such a pat down and partial strip search was amplified by several factors: the cross-gender aspect; the fact that it took place in the presence of many officers and cadets, one third of whom were female; and that it took place in the presence of a person with a hand-held camera, notwithstanding the fact that the record does not give rise to the inference that Byrd's search was recorded.

Yet, while prisoners and detainees retain "legitimate expectations of bodily privacy from persons of the opposite sex," we are obligated to acknowledge that such rights are "extremely limited." *Jordan*, 986 F.2d at 1524. The hallmark of the Fourth Amendment is reasonableness, *see, e.g.*, *Bell*, 441 U.S. at 558, and we must assess reasonableness in the context

of detention settings and the intractable problems facing prison administrators, *see, e.g.*, *Turner*, 482 U.S. at 84-89. We review this case in the additional light of the jury's findings that the search was not conducted in an inappropriate manner and that it was conducted for an identified security need; the undisputed evidence of the County's staffing issues; and the County's existing restrictions on cross-gender contact between detention officers and inmates. We also take seriously the Supreme Court's direction that, in reviewing security- and operations-related restrictions or conditions imposed by prisons, "courts must heed our warning that 'such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' " *Bell*, 441 U.S. at 540 n.23 (quoting *Pell*, 417 U.S. at 827 (alteration omitted)). Given these factors, even viewing the facts (other than those found by the jury) in the light most favorable to Byrd, we cannot conclude that the district court erred in determining that the search did not violate Byrd's Fourth Amendment rights.

The judgment of the district court is **AFFIRMED**.

FERNANDEZ, Circuit Judge, concurring and dissenting:

I concur in part and dissent in part. In particular, I concur in most of the well reasoned majority opinion, but dissent from the determination in part IVB that the cross-gender search was reasonable under the circumstances and was not a violation of the Fourth Amendment.

In my view, cross-gender strip searches are generally uncalled for and unreasonable. We have never held that any cross-gender strip search is proper, although we have allowed

for situations where female guards can observe unclothed male prisoners,[1] and have even approved of the pat down of fully clothed male prisoners by female guards.[2] Moreover, in one case we determined that a cross-gender search of clothed female prisoners by male guards was unconstitutional under the circumstances presented in that case, but the basis of our decision was not the Fourth Amendment. *See Jordan v. Gardner*, 986 F.2d 1521, 1523-26 (9th Cir. 1993) (en banc).

I do not suggest that a cross-gender strip search can never be appropriate. There may be emergency or other situations where a cross-gender strip search is proper, but this case presents no facts to suggest that there was an emergency or some other unique reason for authorizing the search. In fact, the record shows that this sort of search is a regular part of the jail's routine,[3] and that there were plenty of men available, who could have conducted the search.[4]

When all is said and done, I would not think it was reasonable for males to strip search females in this kind of situation, and I do not think it was reasonable to have females strip search males. If our law does approve of it, and the majority opinion cogently reasons that it does, I reluct; the law should change.

---

[1] *See Michenfelder v. Sumner*, 860 F.2d 328, 333-34 (9th Cir. 1988); *Grummett v. Rushen*, 779 F.2d 491, 495-96 (9th Cir. 1985).

[2] *See Grummett*, 779 F.2d at 496.

[3] The County has indicated that "[i]t is our custom and practice to perform regular mass pat searches and cell searches in Durango Jail for security purposes. . . . Pat searches and cell searches are always together and routinely performed for security purposes about four times a month." It is interesting to note that the County, throughout, insists that this strip search was merely a pat search. It shrinks from suggesting that cross-gender strip searches would be appropriate under these circumstances.

[4] For example, O'Connell testified that of some thirty-two to forty-five cadets on hand only a couple were females.

Thus, I respectfully dissent in that respect and otherwise concur in the majority opinion.